UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

| | |
|---|---|
| In re | CASE NOS.  12-19084-BKC-RBR, |
| | 12-19085-BKC-RBR, |
| SMF ENERGY CORPORATION | 12-19086-BKC-RBR & |
| H&W PETROLEUM COMPANY, INC. | 12-19087-BKC-RBR |
| SMF SERVICES, INC. | |
| STREICHER REALTY, INC. | CHAPTER 11 |
| | (JOINTLY ADMINISTERED) |
| Debtors. | |

_____/

| | |
|---|---|
| SONEET R. KAPILA, Liquidating | ADV. NO. |
| Trustee of the SMF Energy Liquidating | |
| Trust, | |
| | |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| | |
| v. | |
| | |
| GRANT THORNTON LLP, an Illinois | |
| limited liability company, | |
| | |
| Defendant. | |

_____/

**ADVERSARY COMPLAINT FOR DAMAGES AND TO AVOID AND
RECOVER AVOIDABLE TRANSFERS AND DEMAND FOR JURY
TRIAL BY AND BEFORE THE BANKRUPTCY COURT**

The Plaintiff, SONEET KAPILA ("Kapila" or the "Trustee"), Liquidating Trustee of the

SMF Energy Liquidating Trust, files this Adversary Complaint for Damages and to Avoid and

Recover Avoidable Transfers and Demand for Jury Trial by and before the Bankruptcy Court,

against the Defendant, GRANT THORNTON LLP, an Illinois limited liability partnership

("Grant Thornton"), and alleges:

**The Parties, Jurisdiction & Venue**

1.     On April 15, 2012, the Debtors, SMF Energy Corporation ("SMF"), H&W

Petroleum Company, Inc. ("H&W"), SMF Services, Inc. ("SMFSI"), and Streicher Realty, Inc. ("Streicher") (sometimes collectively referred to herein as the "Debtors"), commenced these cases by filing voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with this Court.

2.      By orders of this Court, each of the Debtors is being jointly administered under bankruptcy Case No. 12-19084-BKC-RBR.

3.      The Plaintiff, Kapila, is the duly appointed Liquidating Trustee for the SMF Energy Liquidating Trust pursuant to that certain Liquidating Trust Agreement filed in conjunction with the Debtors' Amended Joint Plan of Liquidation (the "Plan"), which Plan was confirmed by the Court on December 14, 2012. The Effective Date of the Plan and Liquidating Trust Agreement was December 28, 2012.

4.      The Defendant, Grant Thornton, an Illinois limited liability partnership, is an accounting firm with its headquarters located at 175 West Jackson Boulevard, 20th Floor, Chicago, Illinois, 60604, and that provided audit and accounting services to the Debtors in Broward County, Florida prior to the Petition Date,.

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(A), (F), (H)  and (O), which includes the assertion of non-core claims as well, and the Trustee consents to the entry of final order and judgment by the Bankruptcy Court pursuant to Fed. R. Bankr. P. 7008(a).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## FACTS COMMON TO ALL COUNTS

**A.  Preliminary Statement**

8.      The claims at issue in this adversary proceeding seek the recovery of damages and other relief from Grant Thornton for professional negligence, negligent misrepresentation, aiding and abetting breach of fiduciary duty, and to avoid and recover avoidable transfers arising out of certain auditing, accounting and other services provided by Grant Thornton and its affiliates to the Debtors prior to the Petition Date.

9.      Specifically, Grant Thornton audited the financial statements of the Debtors, for each of the fiscal years ended June 30, 2005 through June 30, 2011, and issued unqualified opinions on these financial statements. Each of the foregoing audits shall collectively be referred to herein as the "Audits." Grant Thornton also performed reviews (the "Reviews") of the Debtors' interim financial information for each of the first three quarters for the fiscal years ended June 30, 2005 through June 30, 2011, as well as for each of the first two quarters for the fiscal year ended June 30, 2012.  In addition to the Audit and Review services, on occasion Grant Thornton provided other accounting and tax services for the Debtors.

10.     The Debtors' main business was the delivery of gasoline and other fuel products and related services to businesses which maintained fleets of vehicles and bulk gasoline tanks.

11.     As set forth herein, certain of the Debtors' officers breached their respective fiduciary duties by, among other things, implementing and perpetuate improper billing practices that surreptitiously increased charges to the Debtors' customers.

12.     These billing practices took different forms but principally included: (i) billing customers for gallons of fuel that were not delivered; (ii) artificially increasing the agreed upon price per gallon of fuel products; (iii) artificially increasing the agreed upon service charges for

delivery of those fuel products; and (iv) artificially increasing the taxes charged on actual gallons delivered.

13.     These charges were hidden from customers and certain of the officers, employees, and directors of the Debtors, and undisclosed in public filings.  Charges were hidden from customers because, among other things, they violated the acceptable and agreed upon terms of contracts between the Debtors and their customers.

14.     Over time, these improper and hidden charges grew to become a significant percentage of the revenue and business model of the Debtors.  Essentially, the charges masked the true financial condition of the Debtors.

15.     Grant Thornton's acts, omissions and breaches of their professional standard of care proximately caused millions of dollars in damages to the Debtors.

**B.  The Debtors**

16.     SMF is a Delaware corporation, which was listed on the NASDAQ Stock Exchange under the symbol "FUEL," until it was de-listed by NASDAQ during this Chapter 11 bankruptcy case.  H&W, SMFSI and Streicher are wholly-owned subsidiaries of SMF.

17.     Prior to becoming a publicly traded company under the name SMF Energy, the company was a private corporation called Streicher Mobile Fueling, Inc., a Florida corporation formed in 1996, along with several subsidiaries.

18.     As its name implied, Streicher Mobile Fueling's operations consisted of mobile fueling which involved delivering fuel to its customers' locations and placing it either into the customers' vehicles or into the customers' storage tanks, and also providing other related services including servicing and lubricants.

19.     In 2001, Streicher Mobile Fueling went public and changed its name to SMF

4

Energy.

**C.  The Key Individuals Involved with the Facts Supporting the Claims**

20.    Prior to the Petition Date, the following individuals, who were the former management and/or professionals of the Debtors, were directly involved in the acts and omissions that give rise to the claims alleged herein:

   a.  Richard Gathright served as the Chief Executive Officer ("CEO"), President, and Chairman of SMF from at least 2002 until mid-November 2011.

   b.  Michael Shore served as the Chief Financial Officer ("CFO") of SMF from mid-2002 to March 2012.  Shore also served briefly as Chief Information Officer during the latter half of 2002.

   c.  Robert Beard served as SMF's Vice President in charge of corporate development and investor relations from mid-2005 until mid-2006; Vice President of corporate administration and development and investor relations from mid-2006 until late 2006; Senior Vice President of marketing and sales and investor relations from late 2006 until mid-2010; and Senior Vice President of operations and sales until March 2012.

   d.  Gary Williams served as SMF's Senior Vice President of commercial operations from late 2001 and Senior Vice President of supply in late 2010.

   e.  Patricia Messenbaugh served as SMF's Vice President of Finance and Accounting from April, 2007 through October 7, 2007.  On October 8, 2007, Messenbaugh was given the additional positions of Chief Accounting Officer and Principal Accounting Officer.

   f.  Steven Goldberg was a member of the Board of Directors of SMF from mid-2005

until March 2012; and the chair of its Audit Committee from mid-2005 until November 2011 when he became the CEO of SMF, a position he held until March 2012.

g.  Gregory Ryberg was a member of the Board of Directors of SMF and its Audit Committee from mid-2002 to mid-2006.

h.  Larry Mulkey was a member of the Board of Directors of SMF and a member of its Audit Committee from late 2002 until March 2012.  Mulkey served as the chair of the Audit Committee from 2003 until early 2004.

i.  Richard Hamlin was a member of the Board of Directors of SMF and was the Chair of its Audit Committee at all times material hereto and at least through May 15, 2005.

j.  James Boyd was a licensed attorney practicing in Fayetteville, Arkansas and served as SMF's outside general counsel from at least on or about April 30, 2004.

k.  S. Lee Terry, Jr. ("Terry") is a partner at the Denver, Colorado based law firm of Davis, Graham and Stubbs and served as SMF's securities counsel from at least 2004 through the date of filing of bankruptcy and further served as Special Counsel to the Audit Committee from at least October 25, 2004 to a date unknown. Terry's specialty is securities and corporate law and he began his career in the Office of the General Counsel for the United States Securities and Exchange Commission.

**D.  The Debtors' Historical Business Operations**

21.    SMF's mobile fueling operations utilized a number of proprietary computer systems developed by SMF.  These systems were used to automate billing practices and reduce

inaccuracies in record-keeping.

22.     The first system was located directly on the SMF trucks that delivered fuel. SMF's drivers, operating tanker trucks that could hold up to three different kinds of fuel, would travel to the customer's yard where the vehicles were stored.  The SMF driver had to scan a unique bar code affixed to each of the customer's vehicles before filling the vehicle's tank.  The fuel pump would not operate if the bar code was not scanned and would not allow the wrong type of fuel to be pumped into the vehicle.  The onboard computer would record the type of fuel and amount of gallons delivered to each vehicle.  Each of these fueling transactions (the "Raw Data") was electronically transmitted to a server at SMF's offices.

23.     The Raw Data was processed by another computer system that applied the fuel prices and other charges.  The data was then routed to the billing department and printed onto invoices or made available to customers on a web portal.

24.     In some instances, printed or handwritten fuel tickets or receipts, showing the actual amount of fuel delivered, were left with customers at the time of the fuel delivery.  This was only a customary practice for clients who were bulk fuel customers,[1] or located within the Texas market.  Most SMF customers did not receive a bulk fuel ticket, but instead either received periodic invoices from SMF or viewed the gallon reports available on SMF's customer web portal.

25.     In addition to commonplace concepts of fair dealing and best practices all entities should adhere to, as a publicly traded company involved in the fuel business, SMF was subject to various layers of state and federal regulation.   In addition, SMF became subject to the requirements of the Sarbanes-Oxley law after its passage.

---

[1] Bulk fuel clients pre-ordered a certain number of gallons in advance to refill large fuel holding tanks. Mobile fueling clients were those whose vehicles were fueled by SMF drivers much like at a gas station.

26.     Additionally, as a provider to the United States governmental entities, SMF had to comply with certain federal statutes which proscribed the making of materially inaccurate and misleading statements to a United States government agency.

**E.   SMF'S Outside Accountants and Auditors**

27.     On or about August 17, 1998, KPMG LLP's predecessor, KPMG Peat Marwick, was appointed by SMF's Audit Committee of the Board of Director's as SMF's new independent certified public accountants.   KPMG LLP remained as SMF's independent certified public accountants until on or about June 16, 2005.

28.     On or about June 16, 2005, Grant Thornton was appointed by SMF's Audit Committee of the Board of Directors as SMF's independent certified public accountants.

**F.   SMF's Legitimate Billing Practices**

29.     SMF, like many in the mobile fueling field, relied heavily upon data provided to it by an independent company called Oil Price Information Services ("OPIS") to set their fuel pricing.   For a fee paid by its subscribers such as SMF, OPIS determines and publishes to its subscribers daily fuel prices based upon the average daily sales rate for wholesale sales of fuel nationally and regionally.

30.     SMF, like other fuel suppliers, purchased fuel products from wholesalers overnight.   During the course of a 24 hour period the price of fuel fluctuates.   OPIS tracks all of these changes and publishes prices 4 to 5 times per day as well as reporting overnight price changes, and the following morning releasing the high, mid and low sale prices.   These files are keyed to various regions and locations throughout the United States.

31.     SMF invoiced most customers for an OPIS price, plus a previously agreed upon service charge of a flat rate delivery charge or a fixed cost per gallon.

32.    The United States Postal Service, who became an SMF contractual customer in 2008, had additional restrictions and conditions in their contract as discussed below.

33.    Certain of SMF's customers had written contracts for OPIS pricing plus a set cost per gallon service charge, hereinafter referred to generically as "contract customers." The remainder of SMF's customers received services pursuant to written quotes, hereinafter referred to as "at will customers." SMF would provide at will customers with quotes using current gasoline prices and service charges based upon the customer's anticipated fueling needs.

G.    **SMF's Materially Inaccurate, Misleading and Hidden Billing Schemes**

34.    From at least in or about September 2003 through on or about April 15, 2012, SMF engaged in highly questionable and improper business practices resulting in the reliance of some of its customers on invoices that were materially inaccurate in terms of billing. Gathright and other of SMF's officers devised and implemented various misleading billing practices, including but not limited to, practices that increased the amount of gallons invoiced beyond what was actually delivered to customers, or which raised the agreed upon or quoted service charge or price per gallon, all in ways that were hidden, and designed to be difficult for customers to detect. (hereinafter referred to as "Materially Inaccurate Billing Practices.")

35.    These materially inaccurate billing practices included:

- The "XM List" – consisting of an up charge to the cents per gallon OPIS price for certain customers;

- The "I.A." – consisting of billing for gallons of fuel that were not delivered; and

- The "Pad" – consisting of an up charge in the price per gallon service charge.

36.    The foregoing billing practices, implemented through various software programs

or codes created by information technology personnel at SMF, are described in more detail below.

### (1) *The XM List*

37.     The first revenue generating up charge implemented by SMF was the XM List (also known as the XMAS List).[2]  This materially inaccurate billing practice was initiated at least as early as September 3, 2003.   Upon information and belief, the name was either adopted because of the fact that it was imposed initially in the pre- Christmas season which was often a slow time for SMF, or in a sarcastic reference to the up charge being a holiday "gift" it was giving to its customers.  Regardless of the genesis of the sarcasm intended in the use of the code name XM or XMAS, the up charge was materially inaccurate, misleading and hidden.

38.     The XM List was a list of select customers for which SMF added various amounts to the price per gallon of fuel products sold to such customers.  The amount of the increase ranged from $0.02 per gallon to $0.1675 per gallon over and above the OPIS price.

39.     At Gathright's direction and with his oversight, Shore and Williams created the original XM List of customers to which a "price exception" was to be applied.  These clients were not advised of, and did not approve, the increase in their OPIS price.

40.     The XM List, or XMAS List, rapidly grew to include more than 900 of SMF's customers and was soon applied to customer's invoices at all times of year, not just during the holidays.

41.     Periodically, those employees responsible for manually implementing the computer code to effect the XM price up charge became concerned about its propriety and legality.  As a result, such employees required that members of SMF's senior management put such requests in "writing" in order to have some sort of protection.  For example, on October 20,

---

[2] XMAS is, of course, a common abbreviation for or reference to Christmas.

2003, Gary Williams and Michael Shore instructed an SMF employee in writing to increase "all XM customers price…" by $0.0175 effective that night.

42.    On the customers' invoices, regardless of whether they were contractual or at will, the increase to the OPIS price was not broken out into a separate line item, but instead was included in the total cost per gallon for fuel.  As a result, it was difficult at best for customers to detect the additional XM List charges.

43.    There were, however, some customers who were able to detect the increased charges and complained to SMF.  In response, SMF provided such customers with a return of some or all of the extra charges, or reduction or elimination of the extra charges.

44.    The XM List billing practice continued uninterrupted until SMF implemented its new accounting system, Great Plains, in or about June 2007.

### (2) *The Incremental Allowance*

#### (a) *Overview*

45.    In or about May 2004, SMF introduced another "revenue enhancing" device, which went by several different coded names: the Incremental Volumetric Allowance, the Program, the Incremental Allowance, Chucky, and most commonly the I.A. (hereinafter referred to as I.A.).

46.    The I.A. increased revenue by charging customers for gallons of fuel that were not actually delivered to the customer.  In the beginning, the I.A. was to be limited to a 4% increase in gallons of fuel over the amount actually delivered.  In other words, if SMF delivered 100 gallons of fuel, then the customer would actually be billed for 104 gallons.  Over time, the I.A. rose to as high as 33% in some cases.

47.    Like the XM List, the I.A. applied to certain customers selected under the

direction of the some of SMF's officers.  It is estimated that originally the I.A. included some 65% of SMF's customers.  Eventually some customers complained, questioned, or actually discovered that they were being billed for more gallons than they received.  In some cases, the customers were removed from the I.A. because they might have the ability to detect the up charge.  In short, efforts and steps were taken to keep the I.A. under the radar and when any customer detected it and complained, they were overwhelmingly given settlements and compromises and removed from the list.

### (b) *SMF Implements the IA Under KPMG's Watch*

48.     On or about April 30, 2004, Michael Shore received a letter from Jim Boyd, Esq. (deceased) purporting to be a legal opinion on the validity of SMF's adoption of an incremental volumetric allowance (I.A.). Mr. Boyd served at that time as SMF's outside counsel. The letter provides an analysis of the I.A.'s propriety.  Mr. Boyd's opinion, based on a limited analysis of only the Uniform Commercial Code, was that the imposition of the I.A. would be acceptable provided that it went undetected for a period of time sufficient to create a course of dealing.

49.     On or about May 13, 2004, there was a meeting of the SMF Board of Directors. Present at that meeting were Directors Gathright, Wendell Beard, Richard Hamlin, Larry Mulkey, Rodney O'Connor, Robert Picow and Greg Ryberg.  Also present were SMF Officers or employees Shore, Gary Williams, and Louise Lungaro (serving as secretary.).  The minutes of the meeting reflect that after initial discussions the officers and employees were excused from the meeting.  Thereafter, there was a discussion about various aspects of the market and increasing revenue, including but not limited to "the new incremental measurement allowance." Also in attendance at this portion of the meeting were unnamed representatives of KPMG.

50.     On or about August 21, 2004, at 7:19 a.m.[3] Gathright sent an electronic mail message (hereinafter referred to as "email") to Lee Terry, Esq. attaching a copy of the Boyd Opinion Letter.  In that email Gathright tells Terry that SMF is "having problems with KPMG on the tax impact (of the I.A.), together with the whole procedure…."  Shortly thereafter, at 7:24 a.m., Gathright forwarded his email to Terry to Boyd and Shore.

51.     On or about August 26, 2004, the Audit Committee of the Board of Directors held a meeting in Executive Session.  Those present at the meeting included the Audit Committee's Chairman Mr. Richard M. Hamlin and its members, W. Greg Ryberg and Larry Mulkey.  Lee Terry, Esq. was also present, serving in this instance as Special Counsel to the Audit Committee.  Terry also served as secretary, and it was noted in the minutes that because the meeting was held in Executive Session, that the minutes would not be kept with the regular minutes and would instead be retained by counsel (Terry) and would not be shared with management.  The minutes of the Executive Session included the following:

    a.  Hamlin noted that the I.A. was being imposed on approximately 65% of SMF's customers;

    b.  Hamlin noted the existence of the Boyd Opinion letter, but specifically highlighted that KPMG continued to have concerns about the propriety of the I.A. practice;

    c.  As a result the Audit Committee requested that Terry provide his opinion on the practice and respond to three specific questions:  was the I.A. in violation of any state or federal law; was the practice ethical; and if challenged would SMF prevail in litigation.

---

[3] Unless otherwise indicated all time references are Eastern Standard or Daylight Time depending on the calendar date.

52.     On or about August 31, 2004, the Audit Committee again met in Executive Session and, similar to the minutes of the August 26th meeting, the minutes of the August 31st meeting were retained by counsel (Terry) and were not shared with management.  During the course of that meeting, Terry gave a summary of his legal opinion regarding the I.A.  That opinion is dated August 31, 2004 and is addressed to the Audit Committee (hereinafter referred to as the "Terry Opinion Letter").

53.     The substance of the Terry Opinion Letter was, in summary, that there is no violation of law or illegal act in connection with the I.A.  However, Terry did advise that the I.A., if continued, should be better disclosed.

54.     Although the I.A. was separately accounted for in SMF's internal records, it was not mentioned in any public filing or financial document published outside of the company. Among the comments in the Terry Opinion Letter was that SMF, as a publically traded company, should adhere to a "higher" ethical standard regarding disclosure.

55.     On or about September 21, 2004 at 2:05 p.m., Terry sent an email to Boyd and copied Hamlin.  In short, Terry reviewed in some detail his opinion and the application of the Federal Trade Commission's "clear and conspicuous" test as applied to the existing disclosures of the I.A. on the back of SMF's invoices. Terry also evidenced his and the Audit Committee's concern that his advice regarding improved disclosures on the invoices had not been given priority by management and that failure to implement the same was critical.

56.     On or about September 27, 2004, a meeting of the Audit Committee was held. Among those in attendance were Mark Goodman and Alice Everette from KPMG, who presented a report of KPMG's audit of SMF for the year ending June 30, 2004 in the form of a Power Point presentation, which is attached to the minutes of the committee meeting.

57.     Among the items noted by KPMG in the section of the report dealing with

Financial Reporting Risks and Issues was the I.A. program. Specifically, KPMG noted:

> In May 2004, the company began charging select customers an incremental amount up to 4/100 (4%). Legal counsel has concluded that they have found no material violation of law or illegal act by the Company with respect to these billing practices and they note that in the unlikely event of an action between the Company and a customer to enforce the **contractual** obligations of the customer to pay the allowance, the Company would probably prevail.

*(boldface added)*. There is no indication in the minutes that any of the Audit Committee members – each of whom had been provided the Boyd and Terry opinion letters, wherein they raised any question about the fundamental misunderstanding by KPMG regarding the scope of the opinion letters. More importantly, Terry, who according to the minutes was present during the entire meeting and who knew or should have known that KPMG's reliance on his opinion letter as approval of the I.A. as to contractual customers was cause for concern, did not raise any questions about this issue. Remarkably, no one corrected this fundamental mistake.

58.     Also present at the September 27, 2004 Audit Committee meeting were certain of the officers of SMF, including but not limited to, Gathright and Shore.   After KPMG's presentation, Gathright updated the Audit Committee and informed them that it was management's intent to discontinue the use of the I.A. in its present form by mid-October.   Of course, it became obvious and clear that SMF did not discontinue the use of the IA and, in fact, the I.A. was more robustly and universally applied as the years went on.[4]

59.     The Board of Directors of SMF met on October 12, 2004.   Also present were Mr. Terry and W.A. Sikora, a consultant who, upon information and belief, had assisted the company

---

[4] It should be noted that the Audit Committee minutes from the September 27, 2004 meeting indicate that at the conclusion of the general session that the committee went into executive session.   To date the Trustee has been unable to locate any minutes from that Executive Committee session.   Minutes of the SMF Board of Directors meeting that same day reflect Hamlin's report that an Executive Session was held and that KPMG was invited to, and did, attend that session.

in obtaining investment capital.  Also present was Gary Williams, Vice President of Commercial Operations.  Williams gave a description of marketing and sales issues which was followed by a long discussion of the I.A.  Terry followed this discussion with a summary of the Audit Committee's then recommendations on the I.A.  As of October 12, 2004, the Audit Committee had apparently evolved to a recommendation that the practice be discontinued entirely or that the previously recommended "clear and conspicuous disclosures" to the customers be implemented.  Gathright followed those statements with an announcement that management would work with counsel to improve the disclosures and otherwise "modify" the billing practices.

60.    On October 25, 2004, the Audit Committee met in Executive Session.  Also present, as before, was Terry who acted as secretary and retained the minutes.

61.    The major topic of discussion at such Executive Session was the I.A.  Hamlin advised that the practice was only an interim measure and would end on December 31, 2004.  Notably there was also a discussion of what Terry proposed as the new "disclosure" to customers.  The consensus and advice was that there should be:

> [I]mproved prominence (asterisks and all capitals on the front of the invoices) and clarity of disclosure (improved language with precise explanation of surcharge and **explanation of taxes**.)

*Id.* at 1. (boldface type added).

62.    Terry went on to report about the company's Los Angeles based tax counsel's advice that taxes would have to be billed on the accounts.  While the minutes do not reflect further discussion on the subject of the import of that advice is obvious.  If taxes had to be billed to the customer on the amounts of goods (gallons) provided on the account, then in the cases where the customer was subject to the I.A., the company would necessarily be collecting from the customer, and paying to the taxing entity, taxes on phantom gallons.   This practice would

later cause significant company resources to be spent addressing concerns of the taxing authorities in California and North Carolina.

63.     On October 25, 2004 at 2:33 p.m., Gathright sent an e-mail to select members of SMF's management and employees, and copied Terry and Boyd. In that email, Gathright represented that the Audit Committee had cleared management to take two steps relative to the I.A.  First, to immediately modify the disclosure language on the affected customer's invoices to "more effectively disclosure (sic) the volume allowance…."  Gathright goes on to announce that thereafter they would "[f]ully eliminate the volume allowance not later than December 31, 2004…." and in its stead implement some other manner of surcharge with full disclosure on the front of invoices and separate line items for taxes and fees on the invoice itself.  Of course, neither step was ever taken or implemented by SMF.

64.     On or about November 10, 2004 the Audit Committee met. Upon information and belief, Terry was present as well as Mark Goodman and Alice Everett of KPMG. KPMG presented its interim review report of the quarter ending September 30, 2004. Notably,  KPMG repeated the portion of the legal opinions in this presentation by cutting and pasting the previous language, and in particular the language in the Terry Opinion Letter. Nowhere in the presentation is it revealed that counsel had – previous to the presentation but after the audit – suggested several changes in the disclosures and specific segregation of the taxes paid on the gallons to ameliorate the excise tax issues.

65.     In essence and as discussed briefly above, the excise tax issue resulted from the fact that the I.A. gallons had to be separately recorded for purposes of paying excise taxes.  SMF obtained fuel from wholesalers on which federal excise taxes had already been paid at the time of receipt.  Because I.A. sales inflated revenue by posting fictitious gallons, which were not obtained from wholesalers, no excise taxes had been paid, requiring SMF to file federal excise

tax returns for the additional, although fictional, I.A. gallons.  The funds to pay those phantom gallon taxes were collected from the customer, in a way doubling down in spirit on the overcharge.

66.    SMF often had difficulty accounting for the tax that it paid on the phantom I.A. gallons.  As noted above, both North Carolina and California taxing authorities raised concerns and issues with the manner in which SMF was dealing with the problem created by the tax on phantom gallons.  *See* paragraphs 107 through 110, *infra.*

67.    Because the I.A. gallons were internally recorded separately from gallons actually delivered, SMF could easily have reflected the I.A. gallons as a separate line item on the customer invoices.  Nevertheless, SMF continued to combine the I.A. gallons with the actual gallons on the customer invoices, an act designed to make it nearly impossible for anyone without knowledge of the I.A. to detect the extra (phantom) gallons.  As a result, computation and payment of taxes became a tangled web fraught with potential legal issues at every turn. Indeed, from the outset of its knowledge of the I.A. billing practice, KPMG at least raised concerns regarding the computation of taxes on the phantom I.A. gallons.

68.    In a Board of Directors meeting on December 9, 2004, Williams announced that the company had implemented the better disclosure language previously discussed.  He also noted that the company was paying excise taxes on "all volumes billed," which would thus include the phantom gallons.  Of course, that practice creates its own subset of materially inaccurate and misleading documents.

69.    By May 4, 2005, KPMG had informed Hamlin and Shore that they would not continue as SMF's accountants beyond the end of the quarter in progress.  Several reasons were expressed for this termination of the relationship by KPMG including Shore's lack of

cooperation and his alleged failure to adhere to Generally Accepted Accounting Principles ("GAAP") in his accounting.  Notably the I.A. and its various issues, including federal excise tax implications, are not specifically mentioned as reasons for the termination.  Within a matter of weeks, Hamlin had also terminated his relationship with SMF.

70.     Or about May 16, 2005, the Audit Committee met in general session.  Present were Larry Mulkey, Greg Ryberg and Robert Picow who had been named as a temporary Audit Committee member.    Also in attendance were Terry and three representatives from KPMG: Robert Slappey, who had taken over as the engagement partner for the relationship, Alice Everett and Jose Rodriguez, a KPMG SEC Compliance Partner.  As before, KPMG presented a report on its previous quarter interim review.  For the first time there was no discussion of the I.A. However, nothing had appreciably changed in terms of the application of the I.A. since previous reporting and KPMG reviews.  There is no apparent explanation for the abrupt omission of the I.A. from the presentation documents by KPMG.

71.     On June 16, 2005, KPMG formally ceased to be SMF's principal accountants. KMPG noted no disagreements with SMF in connection with SMF's filing of the requisite SEC 8-K announcing the termination (save for the inability to respond to the retention of Grant Thornton or communications between Grant Thornton and SMF).

### *(3) The Pad*

72.     SMF also implemented another hidden up charge known as the "Pad."  The Pad was initially started as a means to recoup transportation costs to markets that were far from fuel suppliers.

73.     As alleged above, when there was no contract in place between SMF and its customer, SMF often had informal agreements with customers detailing how the fuel would be

priced.  Typically SMF would quote daily OPIS rates, plus applicable taxes, and a cents-per-gallon service charge.

74.      By using the Pad, SMF would increase the base cost of the fuel beyond OPIS pricing before applying taxes and service charges.  For example, a quote for services might be OPIS + $0.20, meaning that the fuel would be priced using the daily OPIS price plus a $0.20 per gallon service charge.  The following example illustrates how the Pad affected pricing, using a hypothetical OPIS price of $2.00 per gallon and a service charge of $0.20:

|  | OPIS price | + | Pad | + | Service Charge | = | Price per gallon |
|---|---|---|---|---|---|---|---|
| Regular pricing: | $2.00 | + | 0 | + | 0.20 | = | $2.20 |
| Padded price: | $2.00 | + | 0.10 | + | 0.20 | = | $2.30 |

75.      Although services charges would be stated separately, the OPIS price and Pad would not be stated separately on an actual invoice as they are in the above example; instead they were combined into a single price per gallon.  Accordingly, using the above example, all the customer would see is either the $2.00 or $2.10 price per gallon before the added service charges.  Unless the customers had access to the OPIS prices (a non-public, paid for pricing service), or requested a specific day's OPIS price from SMF, they would have no way to break down the cost per gallon they had been billed.

76.      Apparently, there were different Pads assessed for a variety of reasons.  As noted above, some regional markets were assessed a permanent flat "Market Pad."

77.      On days when SMF bought fuel at prices that ended up being higher than OPIS (largely because different suppliers charged different prices, which fluctuated during the overnight hours), SMF would assess a "Blanket Pad" to customers to recoup that increased cost. On days when SMF bought fuel at lower pricing, on the other hand, they would not give their customers the benefit of those savings.

78.     Some customers, in addition to being assessed Market or Blanket Pads, were also assessed their own "Customer Pad."  In some cases, this was done to recoup refunds when SMF was forced to return other forms of overcharges to the customer.  In other instances, the Customer Pads made up for lost revenues when SMF had to lower its service charges in order to retain the client.  Finally, some Customer Pads were applied simply because SMF knew the customer was not carefully monitoring the OPIS price.

79.     Consequently, the amounts and applications of the Pads changed frequently, sometimes daily.  Records obtained from the Debtors' systems indicate that Market Pad charges ranged from a fraction of a penny, up to $0.69 per gallon..

## H. Grant Thornton's Services as Independent Auditor

80.     On or about June 16, 2005, the Audit Committee of the Board of Directors retained Grant Thornton to assume the role as SMF's independent accountants.

81.     In regard to the services rendered for the Debtors, Grant Thornton represented that it would conduct, and was otherwise obligated to conduct, its Audit in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB")[5], the objective of which was to express an opinion on the fairness of the presentation of the Debtors' consolidated financial statements in conformity with GAAP.  In addition, Grant Thornton was engaged to perform quarterly Reviews of the Debtors' records beginning the fiscal year 2005 and continuing through the first two quarters of 2012 in accordance with the standards of the PCAOB.  A Review is substantially narrower in scope than an audit.  The objective of a Review is to provide a basis for communicating whether there are any material modifications that should be made to

---

[5] In April 2003, the PCAOB adopted certain preexisting standards as its interim standards. Pursuant to Rule 3200T, Interim Auditing Standards consist of Generally Accepted Auditing Standards ("GAAS"), as described in the AICPA's Auditing Standards Board's Statement of Auditing Standards No. 95, as in existence on April 16, 2003, to the extent not superseded or amended by the Board.

the interim financial information for it to be in conformity with GAAP.

82.    On or about October 5, 2005, Grant Thornton partners Gregory Rusk and Alex Rhodes attended a meeting of SMF's Audit Committee and presented a Power Point presentation summarizing its audit for the fiscal year ending June 30, 2005. Notably, there is no mention of the I.A., the issues relating to the excise tax issues or inadequate disclosures. It is as if the I.A. and its many problems as identified only a year before had simply never taken place.

83.    It is clear that Grant Thornton had actual knowledge that the I.A. had more than doubled from the level that Boyd and Terry had found to be non-material, albeit with disclosure caveats which were never adopted. For example, Grant Thornton's Audit Program for Revenue work paper for the fiscal year ending June 30, 2008, contains a note from "EP" that Messenbaugh had informed them that as of June 30, 2008 the rate was 9%.

84.    Indeed, throughout Grant Thornton's work papers and analytical documents there are repeated references to the I.A. and in particular the amounts accrued as payables relating to the payment of the excise taxes.

85.    Grant Thornton appears to have totally missed the existence of the Pad all together, or at least there is no mention made of it in its work papers or reviews.  This occurred in spite of the fact that, as described herein, Grant Thornton's audit planning work papers identified the revenue cycle as a "significant audit area" requiring special focus and testing

86.    In fact, a review of the totality of Grant Thornton's work papers and documents reveals a complete failure to comprehend the manner in which the I.A. and Pad were imposed on SMF customers.  As a result of that failure, Grant Thornton simply ignored the red flags regarding the materiality of the I.A., as well as the Pad, as a percentage of SMF's gross profits.

a.    For the FY ending June 30, 2008, Grant Thornton identified a Materiality Threshold of $330,000.00.  Had they done a competent and correct review of the

SMF account, they would have determined that the total billings for that year attributable to the I.A. equaled $6,519.609.00 and that the total billings attributable to the imposition of the Pad equaled $2,086,052.00. Thus, the combined total was $8,605,661.00 – well in excess of Grant Thornton's materiality threshold. In fact, the I.A. represented 50% of SMF's gross profits for the year and the Pad represented 17% of SMF's gross profits for the year. Simply put, the I.A. and the Pad accounted for 67% of SMF's gross profits for the FY ending June 30, 2008.

b. For the FY ending June 30, 2009, Grant Thornton identified a Materiality Threshold of $249,000.00. Had they done a competent and correct review of the SMF account, they would have determined that the total billings for that year attributable to the I.A. equaled $8,762,158.00 and that the total billings attributable to the imposition of the Pad equaled $2,933,131.00. Thus, the combined total was $11,695,289.00 – well in excess of Grant Thornton's materiality threshold. In fact, the I.A. represented 53% of SMF's gross profits for the year and the Pad represented 18% of SMF's gross profits for the year. Simply put, the I.A. and the Pad accounted for 71% of SMF's gross profits for the FY ending June 30, 2009.

c. For the FY ending June 30, 2010, Grant Thornton identified a Materiality Threshold of $185,000.00. Had they done a competent and correct review of the SMF account, they would have determined that the total billings for that year attributable to the I.A. equaled $10,918,323.00 and that the total billings attributable to the imposition of the Pad equaled$2,503,078.00. Thus, the

combined total was $13,421,401.00 – well in excess of Grant Thornton's materiality threshold.  In fact, the I.A. represented 72% of SMF's gross profits for the year and the Pad represented 16% of SMF's gross profits for the year.  Simply put, the I.A. and the Pad accounted for 88% of SMF's gross profits for the FY ending June 30, 2010.

d.    For the FY ending June 30, 2011, Grant Thornton identified a Materiality Threshold of $185,000.00.  Had they done a competent and correct review of the SMF account, they would have determined that the total billings for that year attributable to the I.A. equaled $13,117,713.00 and that the total billings attributable to the imposition of the Pad equaled $2,232,743.00.  Thus, the combined total was $15,350,456.00 – well in excess of Grant Thornton's materiality threshold.  In fact, the I.A. represented 78% of SMF's gross profits for the year and the Pad represented 14% of SMF's gross profits for the year.  Simply put, the I.A. and the Pad accounted for 92% of SMF's gross profits for the FY ending June 30, 2011.

### *a. The USPS Contract*

87.    Although already supplying fuel to the United States Postal Services ("USPS"), on June 9, 2008, SMF issued a bid for a new contract to provide mobile fueling services to a significant number of sites operated by the USPS.

88.    On September 5, 2008, SMF was awarded contract number 5CAMGT-08-B-0009 (the "USPS Contract") for a two-year term commencing on November 2, 2008, and renewable at the option of the USPS for up to two additional two-year terms.

89.    The USPS Contract provided for SMF to service over 300 post offices located in Florida, Louisiana, Mississippi, and Nevada; and anticipated that it would require 7.1 million

gallons of fuel annually to service the 10,300 vehicles at these locations.

90.      The USPS Contract provided specific pricing terms.  The fuel was to be priced according to the daily OPIS prices, with allowable excise, environmental, and miscellaneous taxes, plus inspection fees where applicable.  Additionally, the USPS Contract provided for a set per gallon service charge of $0.309, $0.3372, $0.394, or $0.45 depending on the location of the post office.

91.      Immediately upon the inception of the USPS Contract, SMF applied the I.A. and Pad charges to invoice amounts in excess of those amounts permitted under the USPS contract. Indeed, beginning with the very first delivery of fuel on November 2, 2008, SMF implemented an I.A. charge of 3% on several USPS locations, which it incrementally increased to 9% by mid-November 2008.  Later, the USPS locations were transitioned to the full I.A. amount, which fluctuated over time but ranged between 18-30% during the time covered by the USPS Contract.

92.      USPS locations were also subject to Pad charges that inflated the agreed-upon service charges.  USPS locations were subject to Market Pads depending on their locations, and at times were assessed a Pad adjustment unique to the USPS.  For example, between November 22, 2008 and February 28, 2010, all Florida USPS locations were assessed a flat pad of $0.10 per gallon.  Those same locations were assessed a $0.15 per gallon up charge during March 2010, and during later months were reverted back to a $0.10 per gallon up charge.  These customer specific pads for USPS locations were in addition to whatever Market Pads may have been assessed.

93.      Like most of its customers, SMF did not provide the USPS sites with fuel receipts at the time of delivery, nor did the invoices supplied to the USPS break out the separate charges for the I.A. or the Pad.  Consequently, determination of how much fuel was actually received, or

how much was being charged over OPIS pricing in violation of the USPS Contract, was masked and virtually impossible to detect.

94.     In fact, the USPS was SMF's single largest source of I.A. revenues, representing up to 50% of the assessed I.A. charges.  For example, during the 12 months from January 2011 through December 2011, SMF delivered 6,923,802 gallons to the USPS, but billed for 8,876,606 gallons.   The extra 1,952,804 gallons billed were I.A. gallons, at a cost to the USPS of approximately $7.7 million.

95.     Koshollek, VP of national accounts, was in charge of the USPS relationship and familiar with the terms of the USPS Contract.  He was aware of the use of and assisted with the implementation of the I.A. and other up charges in violation of the USPS Contract.

**b.   _The I.A. application to other customers_**

96.     SMF's second largest customer, YRC, Inc. ("YRC"), was also SMF's second-largest I.A. revenue-generator.  During just the six month period from June to November 2011, YRC was charged for approximately 580,000 I.A. gallons, or $2.2 million in gallons of fuel it did not receive.

97.     The USPS and YRC were not alone. SMF implemented the I.A. across the board. Certain of the Debtors' officers and senior management were, however, careful not to cause SMF to charge the I.A. to customers who could easily detect it. For example, certain regional customers were not charged I.A., including all of SMF's Texas customers, most of which were carried over from SMF's acquisition of H&W. It was H&W's practice to leave fuel receipts with each of its customers at the time of fueling. Because the I.A. gallons were not added at the point of delivery, but later during the billing process, a customer who received fuel receipts would have the ability to determine that their invoices included more gallons than were actually delivered. Therefore, no I.A. gallons were charged in the Texas market.

c.   ***The unchecked escalation of the I.A.***

98.      Rather than being eliminated, the I.A. grew exponentially over the next several years without the recommended modifications to the disclosures to customers.  In some cases, the I.A. reached 33% over the gallons actually delivered to a customer.  The first increase in the I.A. occurred in October 2007 when the I.A. went from 4% to 6%.  In subsequent years, the I.A. fluctuated greatly, increasing and decreasing at times on a weekly basis, but generally increasing before the end of each quarter as the Officers attempted to inflate quarterly revenues. The I.A. ranges for these years were as follows:

| FYE | I.A. amounts |
|-----|--------------|
| 2007 | 4% |
| 2008 | 6% - 20% |
| 2009 | 15% - 25% |
| 2010 | 25% - 33% |
| 2011 | 25% - 33% |

99.      There was no consistent formula for changing the amount of the I.A. charged. Changes were made at the whim of the Officers.  As the market cost of fuel rose for all consumers between 2007 and 2012, the I.A. collections also grew.  Since the I.A. was generated as a percentage of actual fuel purchases, the higher the actual purchase price of the fuel, the higher the I.A.  For example, 4% of 100 gallons at $3 per gallon yielded higher revenues for SMF than 4% of 100 gallons at $2 per gallon.  Because there was little cost associated with the I.A. gallons, the I.A. revenue was pure (albeit improper) profit for the company.

100.    Again, the cryptic effort at disclosure of the IA was written in the same typeface and buried on the back of the invoice in the middle of the fourth of six paragraphs containing boilerplate language.  As time passed, the font of the disclosures became smaller and smaller making them extremely difficult to read.

c.   ***Complaints and investigations***

101.    SMF's records indicate that from time-to-time customers realized they were being charged for more gallons than were delivered.

102.    Under the direction of Officer Steve Leavitt, the customer service personnel handling such complaints would not advise the customers that the excess charges were related to the I.A. disclosed on the backs of their invoices.  Instead, in an effort to keep the I.A. hidden from its customers, SMF would simply refund some or all of the I.A. amounts, proffering a laundry list of diversionary excuses.

103.    Internal forms used to request refunds were initiated or approved by various officers, including Shore, Leavitt, Koshollek, Williams, or Beard.  Although refunds were issued, Shore, Leavitt, Koshollek, Williams, or Beard, with oversight and direction from Gathright, at times directed secret increases to other amounts charged to the same customers to recoup the refund.  If it appeared that the customer was likely to notice continued I.A. charges (i.e. because they tracked their fuel or received fuel receipts at the time of service), the client was removed from the I.A. program altogether.

104.    Generally, refunds were given without any explanation to the customer.  When something more was needed to placate a particular customer, the extra charges were blamed on fictitious training issues with the driver or computer glitches.

105.    At other times, customers called to complain, not realizing that they were being charged for fictional gas, but nevertheless were feeling the pinch of unexplained increases in fuel costs.  In order to retain these clients, SMF would agree to make certain adjustments to the customers' billing on a short- or long-term basis.  Internally, SMF would reduce, but not eliminate, the I.A. for this customer to find a balance that the customer could absorb.

106.    In responding to complaints and adjusting charges, SMF's main goal was to preserve the I.A. and prevent its discovery by SMF's customers. To this end, officers directly, or by

instruction to employees, misled customers about the overcharges, and generally worked to divert accusations of impropriety. The I.A. was, however, occasionally discovered. As the company grew more reliant on the I.A., these discoveries should have been considered and addressed by the directors as well as SMF's outside professionals, but they appeared to continue to be willfully blind to the pervasive and improper billing practices.

107.    As noted above, KPMG immediately raised its concerns regarding the I.A. particularly as it related to the payment and collection of monies for excise taxes.  Its concerns were well founded, although its handling of those concerns fell short of the mark.

### *North Carolina*

108.    SMF provided fuel to a number of customers located in North Carolina, for which SMF was required to remit certain taxes to the state.

109.    In or about June 16, 2006, North Carolina initiated an audit of the state fuel taxes paid by SMF, which would have included payment of taxes on I.A. gallons.  The auditors requested information for sample months April 2004, August 2005, October 2006 and February 2007.

110.    In 2007, at the conclusion of its audit, North Carolina instructed SMF to cease charging the I.A. immediately.  Apparently SMF failed to heed the direction and on November 20, 2007 counsel for the North Carolina Department of Revenue issued a second cease and desist notice to SMF instructing that the I.A. be immediately discontinued (at least as to North Carolina customers over which it had jurisdiction). In fact, counsel advised that in her view the practice was a misdemeanor under North Carolina law.  By June of 2008, SMF had reached a resolution with North Carolina resulting in management's instruction that the I.A. was to be "turned off" for all customers in North Carolina.

111.    Remarkably, in spite of the clear and specific red flag and shot fired across its

bow, SMF's continued imposition of the I.A. in other states and Grant Thornton, SMF's accountants at the time, was seemingly unmindful of the significant implications of this tax related issue.

### ii. *The California tax audit*

112.    In 2010, the state taxing authorities in California began an audit of SMF, focused on SMF's billing practices, specifically the payment of state fuel taxes on the I.A. gallons.  The audit was reported to the Board of Directors and was discussed in the Board meeting held on September 27, 2010.  Third party professionals present at the meeting included Terry, and Scott Mager, Ciro Buttacavoli, Mark Margullis, and R. Douglas Gawrych – each of whom was a partner at Grant Thornton.  Despite being informed of the California audit, Grant Thornton again shirked its professional duties by failing to inform themselves of the basis or detail of the state's inquiry and to follow up on the issue and get to the root of the problem.  Indeed, had they exercised proper care and diligence in the performance of their professional obligations from the outset they should have been alerted to and raised the problem upon their retention in 2005.  Yet despite literally being hit over the head with the proverbial two by four, the amassed accounting firepower at this meeting appears to have done nothing to address the underlying issue – the propriety of the I.A.

### I.  **The End of the Line**

113.    By 2011, SMF was heavily dependent on the various pricing strategies devised, applied, and concealed from customers.  Indeed as noted above, by the FY end June 30, 2011, the I.A. and Pad represented a staggering 92% of SMF's gross profits.

114.    Despite the continued use of the I.A., Pad, and XM List charges, the Officers and Directors continued to make misleading reports to shareholders and the general public about

SMF's financial growth.  None of SMF's professionals took any meaningful steps to stop the practice and, at best, were grossly negligent in the performance of their professional obligations by their separate and distinct failures to do so.

115.    In November 2011, Gathright was pushed out and forced to retire from his position as CEO, President and Chairman of the Board of Directors.  Longtime director, Goldberg, was named as CEO in Gathright's place.

116.    As noted above, Goldberg was a member of the Audit Committee from 2005 through 2011.  Although the Audit Committee's investigation of the I.A. predated Goldberg's tenure, minutes from the Board of Directors meetings, as well as the Terry Opinion Letter were made available to him.

117.    Shortly after becoming the CEO, however, Goldberg became concerned about the I.A.  It would be a few months before the full import of the billing practice became clear to him.

118.    Upon discovering the magnitude of the I.A. charges, Goldberg requested that Terry review the current practice and update his legal analysis from the 2004 Terry Opinion Letter.  After his review, Terry advised that the I.A. should never have been applied to contract clients, like the USPS; and as to the "at will" clients, it was not being used as originally contemplated when he rendered the Terry Opinion Letter because it had grown far beyond the 4% up charge to a whopping 33%.  Terry never made mention of the form of clear and conspicuous disclosure he had championed in 2004 and which management never employed. Nor did he address his failure, once the I.A. had surpassed Terry's arbitrary threshold of 4% in terms of materiality, to counsel the disclosure of the matter in the company's SEC filings.

119.    In February 2012, Goldberg retained attorney Raymond V. Miller, Esq., to review and render an opinion on the I.A.  Miller's opinion confirmed that the use of the I.A. was

improper.  Miller advised Goldberg that the I.A. should be terminated as quickly as possible.

120.    On March 7, 2012, Goldberg directed the company to terminate the I.A. applied to the USPS.  The I.A. was terminated as to all other customers the following week.

121.    The termination of the I.A. choked off the company's revenue such that it could no longer support its operations.

122.    A month later, on April 15, 2012, the Debtors filed for Chapter 11 protection.

123.    As of the filing of this complaint, the USPS has filed an amended claim in the amount of $65,031,059.00.

**J.   The Improper Accounting Methods**

127.    Grant Thornton and certain of the Debtors' officers and senior management knew or had reason to know that  certain information contained in Debtors' records were materially misstated or otherwise failed to provide the true financial condition, business affairs or financial affairs of the Debtors (collectively, the "Material Misstatements"), thereby resulting in, among other damages, an unduly artificially prolonged existence causing increased insolvency, increased liabilities and diminution in the assets and enterprise value of the Debtors.

128.    Further, Grant Thornton and certain of the Debtors' officers and senior management knew or had reason to know that the Debtors had failed to undertake adequate measures or implement sufficient safeguards or controls to prevent the Material Misstatements from occurring at or during certain material periods of time, or otherwise failed to demand or ensure that sufficient safeguards or controls were or would be implemented by the Debtors to prevent the Material Misstatements from occurring.

129.    To the extent adequate measures or controls were in place, they were ignored or otherwise overridden by certain of the Debtors' officers and senior management, and/or or they

32

willfully turned a blind eye in regard to the questionable business practices being engaged in by the Debtors. Irrespective, Grant Thornton did not appear to adequately plan and perform its Audits in accordance with Generally Accepted Auditing Standards ("GAAS") to obtain reasonable assurance about whether the financial statements were free of Material Misstatements.

130.    Specifically, Grant Thornton did not adhere to GAAS, GAAP and/or other applicable standards of care by, among other negligent, grossly negligent and/or reckless acts and omissions, committing the acts and omissions set forth below and as alleged above:

      a.    failing to detect, disclose and accurately report the occurrence and impact of the ongoing materially inaccurate billing practices alleged above (the "Materially Inaccurate Billing Practices") to the Debtors' Audit Committee;

      b.    failing to detect, disclose and accurately report the occurrence and impact of the Materially Inaccurate Billing Practices in the Debtors' financial statements, footnotes and SEC reports;

      c.    failing to detect, disclose and accurately report the occurrence and impact of the Materially Inaccurate Billing Practices on the United States Postal Service to the appropriate United States Government Agencies;

      d.    failing to detect, disclose and accurately report the occurrence and impact of the Materially Inaccurate Billing Practices to various state taxing authorities.

**K.  Grant Thornton Never Resigns or Withdraws from its Representation of the Debtors**

131.    Despite the existence of multiple red flags learned during the performance of the Audits, Reviews and other accounting services, each of which raised serious issues and concerns regarding the appropriateness of the Debtors' business and financial reporting and operations,

including questions regarding the integrity of management, the Debtors' grossly deficient and/or non-existent internal administrative and accounting controls, and the Debtors' officers and senior management's repeated inability to accurately report financial information to third parties, Grant Thornton never resigned or otherwise withdrew from the representation of the Debtors.

**L. The Debtors' Deepening Insolvency and Other Damages to the Estate and its Creditors**

132.    Between June 30, 2004 and December 31, 2011, and immediately prior to the Petition Date of April 15, 2012, the Debtors incurred substantial debt totaling approximately $68 million owed to a multitude of creditors and customers, as evidenced by the proofs of claim filed against the bankruptcy estates.  Such proofs of claims pending against the estates were incurred, in whole or in part, as a result of the acts and omissions of Grant Thornton alleged herein in regard to the performance of its Audits, Reviews and other accounting services rendered to and for the Debtors.

**M. Conditions Precedent**

133.    All conditions precedent to the filing of this action have occurred, been satisfied or waived.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/**
**ACCOUNTING MALPRACTICE**

The Trustee sues Grant Thornton and alleges:

134.    The Trustee realleges paragraphs 1 through 133 above.

135.    This is a claim against Grant Thornton seeking damages for professional negligence/accounting malpractice.

136.    Grant Thornton, as professional independent auditors performing audit and accounting services for the Debtors, had and owed a duty to the Debtors to exercise a reasonable

degree of care and competence in the performance of the Audits, Reviews and other accounting services, and in the presentation of financial statements reflecting the financial condition of the Debtors, which duty required Grant Thornton to possess, among other things, the degree of learning and skill of a professional auditor/accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional auditors/accountants under similar circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which they were engaged.

137.    Under applicable law as professional auditors/accountants, Grant Thornton's express purpose here was to, among other things, conduct a GAAS compliant audit of the financial statements for the Debtors for the years ending June 30, 2005; June 30, 2006; June 30, 2007; June 30, 2008; June 30, 2009; June 30, 2010; and June, 30 2011, and to review the financial statements included in the quarterly Form 10-QSBs, which Grant Thornton knew were being filed with the SEC.

138.    To achieve these purposes, and satisfy their obligations under applicable law as professional auditors/accountants, Grant Thornton was required to, among other things, conduct the Audits of the Debtors' financial statements in accordance with GAAS and the applicable professional guidelines and standards, including those requirements of GAAS that required Grant Thornton to properly plan and perform the Audits so as to obtain reasonable assurance about whether the financial statements were free of material misstatement and in conformity with GAAP.

139.    Grant Thornton breached its duties to the Debtors by failing to use reasonable diligence, adequate care and skill, and best judgment in the conduct of the Audits of the Debtors. Grant Thornton's failure can be traced to its repeated deviations from GAAS and the applicable

professional guidelines and standards, promulgated by the American Institute of Certified Public Accountants ("AICPA") Auditing  Standards Board, including the Statements on Auditing Standards, the official pronouncements issued on auditing matters.

140.    Specifically, Grant Thornton breached its duties to the Debtors by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits and/or Reviews including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), and (v) providing informative disclosure (Standards of Reporting No. 3).

141.     Specifically, in regard to the accounting and other services it performed for the Debtors, including the Audits and Reviews, Grant Thornton did not adhere to GAAS, GAAP and other applicable standards by, among other acts and omissions:

  a.  in violation of Statement on Auditing Standards ("SAS") no. 99 (AU Section 316 - Consideration of Fraud in a Financial Statement Audit),  failing to assess the risk of material misstatement due to fraud by, among other things, failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud;

  b.  in violation of SAS no. 1 (AU Section 110 - Responsibilities and Functions of the Independent Auditor), by failing to conduct Audits that would allow an expression of an opinion on the fairness, in all material respects, of the financial position, results of operations, and cash flows of the Debtors in conformity with GAAP;

c.      in violation of SAS no. 95 (AU Section 150 - Generally Accepted Auditing Standards, SAS no. 1 (AU Section 230 -  Due Professional Care in the Performance of Work), and the AICPA Audit and Accounting Guide, failing to properly analyze or otherwise prepare proper documentation confirming financial data of the Debtors;

d.      in violation of SAS no. 95 (AU Section 150 - Generally Accepted Auditing Standards, SAS no. 1 (AU Section 230 - Due Professional Care in the Performance of Work), SAS no. 56 (AU Section 329 -  Analytical Procedures), and the AICPA Audit and Accounting Guide, failing to adequately perform compliance testing by, among other things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding the Statement of Operations and the impact of I.A. on profitability.

e.      in violation of SAS no. 56 (AU Section 329 -  Analytical Procedures), and the AICPA Audit and Accounting Guide, failing to develop industry and client expectations regarding the relationship among the financial statement components including verification of the liability stemming from the cumulative  I.A. and Pad overcharges;

f.      in violation of SAS no. 95 (AU Section 150 - Generally Accepted Auditing Standards), SAS no. 1 (AU Section 230 - Due Professional Care in the Performance of Work), and the AICPA Audit and Accounting Guide, failing to gain sufficient knowledge of the client and its industry;

g.      in violation of SAS no. 1 (AU Section 230 - Due Professional Care in the

Performance of Work), failing to exercise professional skepticism;

h.  in violation of SAS no. 1 (AU Section 210 - Training and Proficiency of Independent Auditor), SAS no. 1 (AU Section 230 - Due Professional Care in the Performance of Work), SAS no. 109 (AU Section 314 - Understanding the Entity and Its Environment and Assessing the Risks of Material Misstatement)or SAS no. 55 - Consideration of Internal Control in a Financial Statement Audit, as applicable, SAS no. 110 (AU Section 318 -  Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained) or SAS no. 55 - Consideration of Internal Control in a Financial Statement Audit, as applicable, SAS no. 56 (AU Section 329 - Analytical Procedures), SAS no. 67 (AU Section 330 - The Confirmation Process), SAS no. 57 (AU Section 342 - Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates;

i.  in violation of SAS no. 1 (AU Section 210 - Training and Proficiency of the Independent Auditor), SAS no. 1 (AU Section 230 - Due Professional Care in the Performance of Work), SAS no. 67 (AU Section 330 - The Confirmation Process), SAS no. 56 (AU Section 329 - Analytical Procedures), SAS no. 57 (AU Section 342 - Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, failing to appropriately plan, design, and implement compliance testing;

j.  in violation of SAS no. 1 (AU Section 561 - Subsequent Discovery of Facts Existing at the Date of the Auditor's Report) and the AICPA Audit and

Accounting Guide, failing properly or timely to withdraw prior Audit opinions;

k.    failing to properly plan the Audits as was required under GAAS, including under SAS No. 99 - Consideration of Fraud in a Financial Statement Audit (involving the integrity of management), in light of the existence of multiple red flags and warning signs that were known to Grant Thornton in advance of each Audit and thereafter; and

l.    other breaches as may be determined through discovery.

142.    Further, even if Grant Thornton had properly planned the Audits, which it did not, Grant Thornton failed to gather sufficient, competent evidential matter to enable them to properly perform the Audits.  In addition, even with the insufficient evidential matter that it had collected, Grant Thornton failed to exercise due professional care and competence in evaluating such evidential matter and in conducting the Audits in general, including the fact that Grant Thornton failed to maintain the requisite degree of professional skepticism required in the conduct of the Audits by, among other things, relying upon documents and other information replete with Material Misstatements.

143.    Finally, Grant Thornton failed to adequately detect and require disclosure of material financial matters concerning the Debtors' true financial condition in the audited financial statements, despite the fact that, among other things, it had missed multiple opportunities to uncover the ongoing series of improper business practices and irregularities being engaged in by the Debtors' officers and senior management.

144.    Based upon the foregoing, as well as other factors, it is clear that Grant Thornton failed and was reckless, grossly negligent, and/or negligent at every step of the audit process.

145.    As a result of the above numerous and material violations of the GAAS standards

and guidelines, Grant Thornton breached its obligations and duties to the Debtors by failing to use reasonable diligence, adequate care and skill, and judgment to accomplish the purpose for which they were engaged.  Such violations and breaches caused, among other harm, the Debtors' financial statements to be materially misstated as reflected in the Audits.

146.    Grant Thornton's negligent, grossly negligent and/or reckless audits of the Debtors proximately caused the Debtors to, among other damages, artificially prolong its existence as its insolvency deepened, which harmed and adversely affected the Debtors. Grant Thornton's failure to, among other things, properly conduct its Audits and Reviews or otherwise issue proper audit opinions concealed the true financial condition of the Debtors, thereby causing the Debtors' existence to be artificially prolonged.

147.    The foregoing acts and omissions are the direct and proximate cause of damages to the Debtors which damages include, but are not necessarily limited to, the substantial increase in the Debtors' liabilities and diminution of the Debtors' assets, asset values and enterprise value.

WHEREFORE, the Trustee demands the entry of a judgment against Grant Thornton for compensatory damages, consequential damages and special damages including, but not limited to: (i) the substantial increase in the Debtors' liabilities; (ii) the substantial diminution of the Debtors' assets, asset values and enterprise value; (iii) the substantial increase in the Debtors' insolvency; (iv) punitive damages; (v) civil penalties as allowed by law; (vi) out-of-pocket fees, costs and expenses attributable and incurred or paid by the Debtors and the Trustee; (vii) all other attributable fines, penalties, attorneys' fees, costs and expenses paid or incurred by the Debtors pre-petition; (viii) the value of all the Debtors' claims against third parties that were not properly or timely pursued by the Debtors; (ix) pre-judgment, post-judgment interest, court costs and expenses; and (x) for any for any other relief the Court deems appropriate.

## COUNT II
## NEGLIGENT MISREPRESENTATION

The Trustee sues Grant Thornton and alleges:

148.    The Trustee realleges Paragraphs 1 through 133 and 141 above.

149.    This is an action against Grant Thornton seeking damages for negligent misrepresentation.

150.    Grant Thornton's multiple breaches of the duties owed to the Debtors caused and contributed to the financial statements containing significant materially inaccurate and misleading information upon which the Debtors relied to its detriment.

151.    Grant Thornton knew or reasonably should have known that the financial statements of the Debtors for the years ending June 30, 2005; June 30, 2006; June 30, 2007; June 30, 2008; June 30, 2009; June 30, 2010; and June 30, 2011, were not free of Material Misstatements and were not consistent with GAAP.

152.    Grant Thornton negligently misrepresented that they had, among other things, conducted the Audits of annual financial statements for June 30, 2005; June 30, 2006; June 30, 2007; June 30, 2008; June 30, 2009; June 30, 2010; and June 30, 2011, for the Debtors in accordance with GAAS and that those financial statements fairly represented the true financial condition of the Debtors.

153.    Grant Thornton failed to use reasonable diligence, adequate care and skill, and best judgment in attempting to accomplish its purpose by failing to identify and report that the accounting and financial records of the Debtors were not maintained in accordance with GAAP. Grant Thornton's failure can be traced to its repeated deviations from GAAS and the applicable professional guidelines and standards, including the Statements on Auditing Standards, promulgated by the AICPA as the official pronouncements on auditing matters.

154.    The Debtors reasonably relied upon Grant Thornton's representations in, among other things, assessing its true financial condition, transferring millions of dollars to third parties and continuing to incur debt, with no reasonable ability to repay such debt.

155.    The Debtors' reliance on the foregoing representations are the direct and proximate cause of damages to the Debtors, which damages include, but are not necessarily limited to, the substantial increase in the Debtors' liabilities and diminution of the Debtors' assets, asset values and enterprise value.

WHEREFORE, the Trustee demands the entry of a judgment against Grant Thornton for compensatory damages, consequential damages and special damages including, but not limited to: (i) the substantial increase in the Debtors' liabilities; (ii) the substantial diminution of the Debtors' assets, asset values and enterprise value; (iii) the substantial increase in the Debtors' insolvency; (iv) punitive damages; (v) civil penalties as allowed by law; (vi) out-of-pocket fees, costs and expenses attributable and incurred or paid by the Debtors and the Trustee; (vii) all other attributable fines, penalties, attorneys' fees, costs and expenses paid or incurred by the Debtors pre-petition; (viii) the value of all the Debtors' claims against third parties that were not properly or timely pursued by the Debtors; (ix) pre-judgment, post-judgment interest, court costs and expenses; and (x) for any for any other relief the Court deems appropriate.

**COUNT III**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY**

The Trustee sues Grant Thornton and alleges:

156.    The Trustee realleges Paragraphs 1 through 133 and 141 above

157.    This is an action against Grant Thornton for aiding and abetting breach of fiduciary duty.

158.    At all material times hereto, the Debtors' officers and other members of senior management owed the Debtors a fiduciary duty to discharge their duties in good faith, with the care that an ordinarily prudent officer or director in a like position would exercise and in a manner reasonably believed to be in the Debtors' best interests.

159.    Lacking good faith, certain of the Debtors' officers and members of senior management exhibited a conscious, grossly negligent and/or reckless disregard for the best interests of the Debtors and its creditors in relation to the facts and circumstances as set forth herein. Said Debtors' officers and senior management knew, or, except for conscious, grossly negligent and/or reckless disregard of the facts, should have known, of the risk of damage that ultimately befell the Debtors.

160.    Certain of the Debtors' officers and senior management continuously and on an ongoing basis, breached their respective fiduciary duties owed to the Debtors by, among other breaches, failing to cause the implementation of sufficient safeguards and controls to ensure that the Debtors' SEC filings accurately portrayed the Debtors' true financial condition.

161.    As a direct and proximate result of these Debtors' officers and senior management's acts and omissions, the Debtors have suffered, among other damages, the loss and/or diminution of the enterprise value of the Debtors, and increased/deepening insolvency.

162.    Grant Thornton had knowledge of and rendered substantial assistance in regard to the breaches of fiduciary duties of the Debtors' officers and senior management, and by so doing aided and abetted such breaches by, among other acts and omissions, failing to perform audits in accordance with GAAS and GAAP, and by otherwise performing its audit and accounting services in a negligent, grossly negligent and/or reckless manner.

163.    Grant Thornton's foregoing acts and omissions are the direct and proximate cause of damages to the Debtors, which damages include, but are not necessarily limited to, the

substantial increase in the Debtors' liabilities and diminution of the Debtors' assets, asset values and enterprise value.

WHEREFORE, the Trustee demands the entry of a judgment against Grant Thornton for compensatory damages, consequential damages and special damages including, but not limited to: (i) the substantial increase in the Debtors' liabilities; (ii) the substantial diminution of the Debtors' assets, asset values and enterprise value; (iii) the substantial increase in the Debtors' insolvency; (iv) punitive damages; (v) civil penalties as allowed by law; (vi) out-of-pocket fees, costs and expenses attributable and incurred or paid by the Debtors and the Trustee; (vii) all other attributable fines, penalties, attorneys' fees, costs and expenses paid or incurred by the Debtors pre-petition; (viii) the value of all the Debtors' claims against third parties that were not properly or timely pursued by the Debtors; (ix) pre-judgment, post-judgment interest, court costs and expenses; and (x) for any for any other relief the Court deems appropriate.

**COUNT IV**
**AVOIDANCE AND RECOVERY OF**
**AVOIDABLE FOUR YEAR TRANSFERS**

The Trustee sues Grant Thornton and alleges:

164.    The Trustee realleges Paragraphs 1 through 133 above.

165.    Based upon the acts, omissions and claims alleged in Counts I through III above, this is an action to avoid and recover certain transfers and/or improperly incurred obligations made from and by the Debtors to Grant Thornton pursuant to Sections 544 and 548 of the Bankruptcy Code, and/or applicable state law, including Chapter 726 of the Florida Statutes.

166.    The transfers at issue in this action are more specifically described as follows:

| Vendor Name | Document Type | Document Date | Document Amount | Posted Date | Transaction Description |
|---|---|---|---|---|---|
| GRANT THORTON LLP | Invoice | 3/5/2008 | $16,148.00 | 5/9/2008 | P/E 12/31/07 |
| GRANT THORTON LLP | Invoice | 4/25/2008 | $15,052.00 | 7/7/2008 | PREFERRED STOCK/FAS GROUP LIT |
| GRANT THORTON LLP | Invoice | 5/27/2008 | $4,770.00 | 7/18/2008 | 4/28-5/1 SEC REVIEW |
| GRANT THORTON LLP | Invoice | 5/27/2008 | $4,558.00 | 7/18/2008 | 4/28 - 5/14-SERIES A& B STK |
| GRANT THORTON LLP | Invoice | 5/27/2008 | $17,600.00 | 7/18/2008 | P/E 5/31 3RD QTR REVIEW |
| GRANT THORTON LLP | Invoice | 7/18/2008 | $10,726.00 | 8/22/2008 | 5/29/08  S3 FILING |
| GRANT THORTON LLP | Invoice | 7/22/2008 | $44,324.00 | 9/7/2008 | 06/30/08 Audit Svcs/Exp |
| GRANT THORTON LLP | Invoice | 8/29/2008 | $74,600.00 | 9/23/2008 | Y/E 6/30/08 AUDIT |
| GRANT THORTON LLP | Invoice | 9/25/2008 | $64,070.00 | 11/3/2008 | P/E 6/30/08 AUDIT BILLING |
| GRANT THORTON LLP | Invoice | 9/30/2008 | $64,070.00 | 11/14/2008 | P/E 6/30/08 AUDIT/EXP |
| GRANT THORTON LLP | Invoice | 12/4/2008 | $16,220.00 | 3/6/2009 | P/E 9/30/08 1st QTR REVIEW |
| GRANT THORTON LLP | Invoice | 12/4/2008 | $6,950.00 | 3/13/2009 | P/E 6/30/08 AUNNUAL AUDIT |
| GRANT THORTON LLP | Invoice | 1/7/2009 | $3,000.00 | 2/16/2009 | Attempt Dec '08 Form S3 Filing |
| GRANT THORTON LLP | Invoice | 3/31/2009 | $16,280.00 | 5/14/2009 | P/E 12/31/08 2nd QTR REVIEW |
| GRANT THORTON LLP | Invoice | 3/31/2009 | $10,700.00 | 5/14/2009 | P/E 3/31/09 FORM S-3 |
| GRANT THORTON LLP | Invoice | 5/19/2009 | $17,160.00 | 7/24/2009 | SVCS P/E 3/31/09 3RD QTR RVW |
| GRANT THORTON LLP | Invoice | 7/17/2009 | $14,840.00 | 8/14/2009 | SVCS RENDERED 6/15-7/09/09 |
| GRANT THORTON LLP | Invoice | 7/21/2009 | $54,300.00 | 8/14/2009 | PRGRS BILLIN 6/30/09 AUDIT |
| GRANT THORTON LLP | Invoice | 6/5/2009 | $5,600.00 | 8/14/2009 | SVCS RNDRD FILIN 1ST AMND 3/31 |
| GRANT THORTON LLP | Invoice | 9/8/2009 | $79,570.00 | 9/29/2009 | PRGRS BILLIN 06/30/09 AUDIT |
| GRANT THORTON LLP | Invoice | 9/22/2009 | $68,924.00 | 11/13/2009 | BILLING AUDIT Y/E 6/30/09 |
| GRANT THORTON LLP | Invoice | 9/30/2009 | $16,554.00 | 11/6/2009 | FNL BILL AUDIT Y/E 6/30/09 |
| GRANT THORTON LLP | Invoice | 11/5/2009 | $17,068.00 | 12/14/2009 | QTRLY REVIEW P/E 9/30/09 |
| GRANT THORTON LLP | Invoice | 11/30/2009 | $5,300.00 | 12/14/2009 | 11/09 AMENDED FORM S3 FILING |
| GRANT THORTON LLP | Invoice | 2/3/2010 | $17,151.00 | 4/21/2010 | QTRLY REVIEW P/E 12/31/09 |
| GRANT THORTON LLP | Invoice | 5/11/2010 | $17,134.00 | 7/15/2010 | 3RD QTR RVW ENDING 033110 |
| GRANT THORTON LLP | Invoice | 7/8/2010 | $58,516.00 | 9/23/2010 | 06/30 AUDIT PROGRM BILLING |
| GRANT THORTON LLP | Invoice | 6/16/2010 | $37,264.00 | 8/13/2010 | 06/30 AUDIT PROGRM BILLING |
| GRANT THORTON LLP | Invoice | 5/20/2010 | $31,800.00 | 8/19/2010 | PROG BILLIN 0630 AUDIT ENGMNT |
| GRANT THORTON LLP | Invoice | 8/27/2010 | $66,982.00 | 10/8/2010 | ENGMNT LETTER 06/30 AUDIT |
| GRANT THORTON LLP | Invoice | 9/29/2010 | $32,667.00 | 11/4/2010 | 6/30 FINAL BILLIN AUDITS |
| GRANT THORTON LLP | Invoice | 11/9/2010 | $19,170.00 | 12/10/2010 | QTRLY REVIEW P/E 09/30/10 |
| GRANT THORTON LLP | Invoice | 10/27/2010 | $4,000.00 | 12/3/2010 | CORP ADDL BILLING 06/30 AUDIT |
| GRANT THORTON LLP | Invoice | 11/17/2010 | $5,300.00 | 12/15/2010 | BILL FOR 11/15/10 FILIN FRM S8 |
| GRANT THORTON LLP | Invoice | 2/14/2011 | $19,212.00 | 2/24/2011 | QTRLY REVIEW P/E 12/31/10 |
| GRANT THORTON LLP | Invoice | 5/6/2011 | $19,236.00 | 5/27/2011 | QTRLY REVIEW P/E 03/31/11 |
| GRANT THORTON LLP | Invoice | 6/29/2011 | $26,500.00 | 7/27/2011 | 06/30 AUDIT W/ENGMNT LETTER |
| GRANT THORTON LLP | Invoice | 7/27/2011 | $37,170.00 | 8/5/2011 | PROGESS BILLIN 06/30/11 AUDIT |
| GRANT THORTON LLP | Invoice | 8/19/2011 | $47,957.00 | 9/6/2011 | 06/30 AUGIDT ENGEMNT LETTER |
| GRANT THORTON LLP | Invoice | 9/14/2011 | $42,870.00 | 9/23/2011 | 06/30/11 PROGRESS BILL/LETTER |
| GRANT THORTON LLP | Invoice | 10/31/2011 | $5,300.00 | 11/10/2011 | 10/28/11 REVIEW OF FORM 10KA |
| GRANT THORTON LLP | Invoice | 11/15/2011 | $19,206.00 | 12/15/2011 | QTRLY REVIEW PE 09/30/11 |
| GRANT THORTON LLP | Invoice | 2/3/2012 | $15,900.00 | 2/24/2012 | PROF TAX SERVICES |
| GRANT THORTON LLP | Invoice | 2/28/2012 | $10,600.00 | 3/8/2012 | PROF TAX SERVICES |
| GRANT THORTON LLP | Invoice | 3/21/2012 | $18,000.00 | 3/23/2012 | 2ND QTR REVIEW - 12/31/11 |
| GRANT THORTON LLP | Invoice | 3/21/2012 | $19,924.00 | 3/23/2012 | DEF TAX ASSET VALUATION |
| GRANT THORTON LLP | Invoice | 3/21/2012 | $1,589.00 | 3/23/2012 | EXPENSES |
| GRANT THORTON LLP | Credit Memo | 3/21/2012 | ($3,951.00) | 3/23/2012 | DISCOUNT |
| | | | $1,219,881.00 | | |

(the transfers referenced above, along with any and all other transfers or incurred obligations made or otherwise incurred from April 16, 2008 through the Petition Date for services rendered by Grant Thornton, including the execution of engagement letters with terms and condition unfavorable to the Debtors, shall collectively be referred to herein as the "Four Year Transfers").

167.    In accordance with Sections 544 and 548 of the Bankruptcy Code and Sections 726.105(1)(b) and/or 726.106(1) of the Florida Statutes and/or other applicable law, the Four Year Transfers are recoverable and avoidable for the benefit of the estate.

168.    Pursuant to 11 U.S.C. §§544(b) and 548, the Trustee may avoid any transfer of an interest in property of the Debtors to Grant Thornton or any obligations incurred by the Debtors that are avoidable under applicable law (in this case, Florida law) by a creditor holding an

unsecured claim.

169.    Pursuant to 11 U.S.C. §550, to the extent that a transfer is avoided under either Section 544(b) or 548 of the Bankruptcy Code, then the Trustee may recover the property transferred or the value of the property from the initial transferee or any mediate or immediate transferee.

170.    The funds that are and were the subject of the Four Year Transfers constituted transfers of an interest in property of the Debtors within four years prior to the Petition Date.

171.    The Debtors made the Four Year Transfers with the actual intent to hinder or delay creditors.

172.    Alternatively, as a result of the acts and omissions of Grant Thornton set forth above, the Debtors did not receive reasonably equivalent value from Grant Thornton in exchange for the Four Year Transfers and the Debtors (i) were insolvent at the time of the Four Year Transfers or became insolvent as a result thereof; (ii) were engaged or were about to engage in a business or transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

173.    At the time of the Four Year Transfers, there were actual creditors who could have avoided the Four Year Transfers, as evidenced by the estate proof of claim register.

174.    As a result of the above, the Trustee can avoid the Four Year Transfers pursuant to sections 544 and 548 of the Bankruptcy Code, Fla. Stat. 726.105(1)(b), 726.106(1) and/or other applicable law, and recover the value of the Four Year Transfers for the benefit of the estate of the Debtors, pursuant to Section 550 of the Bankruptcy Code.

175.    Pursuant to 11 U.S.C.  §§544, 548 and 550 and Chapter 726 of the Florida

Statutes, the Trustee is entitled to recover from Grant Thornton the value of the Four Year Transfers.

WHEREFORE, the Trustee demands judgment against Grant Thornton as follows: (i) determining that the Four Year Transfers were fraudulent and avoiding the Four Year Transfers for the benefit of the estate of the Debtors under 11 U.S.C. §§544(b), 548 and 550 and Chapters 726.105(1)(b) and/or 726.106(1) of the Florida Statutes and/or other applicable law; (ii) entering judgment in favor of the Trustee against Grant Thornton for the amount of the Four Year Transfers pursuant to Section 550 of the Bankruptcy Code, together with pre-judgment and post-judgment interest and costs; and (iii) for any other relief the Court deems appropriate.

## COUNT V
## AVOIDANCE AND RECOVERY
## OF 90 DAY PREFERENTIAL TRANSFERS

The Trustee sues Grant Thornton and alleges:

176.    The Trustee realleges Paragraphs 1 through 133 and 166 above.

177.    This is an action to avoid and recover certain transfers made by the Debtors to Grant Thornton within 90 days of the Petition Date as preferential transfers pursuant to Section 547 of the Bankruptcy Code, as set forth and described in Paragraph 163 above (the "90 Day Transfers").

178.    Pursuant to 11 U.S.C. § 550, in a preferential transfer action commenced under Section 547 of the Bankruptcy Code, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; (2) any immediate or mediate transferee of such initial transferee; or (3) any commercial conduit lacking good faith in receipt of such property.

179.    The 90 Day Transfers constituted initial and/or subsequent transferee transfers of property of the Debtors made: (i) within 90 days and before the Petition Date; (ii) to or for the benefit of Grant Thornton, which, at all relevant times, was a creditor of the Debtor; (iii) for or on account of an antecedent debt owed by the Debtors to Grant Thornton before such transfers were made; and (iv) while the Debtors were insolvent.

180.    The 90 Day Transfers enabled Grant Thornton to receive more than it would have received if: (i) this case was a case under Chapter 7 of the Bankruptcy Code; (ii) the 90 Day Transfers had not been made; and (iii) Grant Thornton received payment of its debt to the extent provided by the Bankruptcy Code.

181.    By reason of the foregoing, the 90 Day Transfers are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Trustee may recover the amount or value of the 90 Day Transfers pursuant to 11 U.S.C. § 550.

WHEREFORE, the Trustee requests that the Court enter a judgment against Grant Thornton that: (i) avoids the 90 Day Transfers to Grant Thornton and recover same for the benefit of the estate; (ii) awards to the Trustee the amount or value of the 90 Day Transfers to Grant Thornton, plus interest and costs; (iii) and awards any other relief the Court deems appropriate.

<u>**COUNT VI**</u>
**<u>ACTION FOR TURNOVER OF PROPERTY OF THE ESTATE
PURSUANT TO SECTION 542 OF THE BANKRUPTCY CODE</u>**

177.    The Trustee realleges Paragraphs 1 through 133 and Counts IV and V above.

178.    This is an action for turnover of property of the estate pursuant to Section 542 of the Bankruptcy Code.

179.    Prior to the Petition Date, Grant Thornton provided certain professional services

as outlined herein to or on behalf of one or more of the Debtors.  In connection therewith, Grant Thornton has within its possession, custody or control documents and records of one or more of the Debtors, and/or documents and records created for the benefit of or at the direction of one or more of the Debtors (collectively the "Documents").

180.    All books, documents, records and papers in Grant Thornton's possession, custody or control, including audit work papers, that either (a) are property of the Debtors' bankruptcy estates or (b) relate to the Debtors' property or financial affairs are subject to turnover pursuant to § 542 of the Bankruptcy Code, as well as the terms of the Plan, Confirmation Order, and Liquidating Trust Agreement.

181.    By letter dated June 11, 2012, counsel for the Trustee served upon Grant Thornton a demand for turnover of the Documents.  Grant Thornton took the position that some of the Documents are not subject to turnover and are protected confidential or proprietary documents belonging to Grant Thornton.  The Trustee disputes the proprietary and confidential nature of these documents and otherwise disputes that such documents are not subject to turnover.   To date, Grant Thornton has not turned over or otherwise made available for inspection and copying any of the Documents.

182.    The Trustee and Grant Thornton attempted to reach a confidentiality agreement in good faith.  The Trustee, however, could not agree to restrictive confidentiality demands made by Grant Thornton that would impede the prosecution of the claims asserted herein, and other claims.  While the Trustee acknowledges Grant Thornton's desire to maintain confidentiality, the Documents are property of the Debtors' bankruptcy estate, and not Grant Thornton, or otherwise relate to the Debtors' property or financial affairs.

183.    As a result of the foregoing, the Trustee is entitled to the immediate turnover from

Grant Thornton of all Documents.

WHEREFORE, the Trustee requests the Court enter a judgment against Grant Thornton that orders it to turnover to the Trustee all Documents, and to grant any other relief the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

182.    The Trustee hereby demands a trial by jury on all claims and issues triable by such, and requests in regard to this demand that the reference to the Bankruptcy Court not be withdrawn, if at all, unless and until all discovery and all pre-trial motions and matters, including case dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court. The Trustee specifically consents to a jury trial before the Bankruptcy Court.

Submitted this 7th day of  February 2014.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL  33131
Tel.: (305) 349-2300
Fax:  (305) 349-2310
Email: dcimo@gjb-law.com


By:   /s/ David C. Cimo
        David C. Cimo, Esq.
        Fla. Bar No. 775400
        Paul J. Battista, Esq.
        Fla. Bar No. 884612
        Theresa Van Vliet, Esq.
        Fla/ Bar. No. 374040