UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re

SMF ENERGY CORPORATION
H&W PETROLEUM COMPANY, INC.
SMF SERVICES, INC.
STREICHER REALTY, INC.

     Debtors.

_____/

SONEET R. KAPILA, Liquidating
Trustee of the SMF Energy Liquidating
Trust,

     Plaintiff,

v.

GRANT THORNTON LLP, an Illinois
Limited Liability Partnership,

     Defendant.

_____/

CASE NOS. 12-19084-BKC-RBR
12-19085-BKC-RBR
12-19086-BKC-RBR
12-19087-BKC-RBR

CHAPTER 11
(JOINTLY ADMINISTERED)

ADV. NO. 14-01162-RBR

## **DEFENDANT GRANT THORNTON LLP'S MOTION TO DISMISS IN PART ADVERSARY COMPLAINT AND INCORPORATED MEMORANDUM OF LAW**

Elizabeth V. Tanis
Ga. Bar No. 697415
  *admitted pro hac vice*
Cheri A. Grosvenor
Ga. Bar No. 314360
  *admitted pro hac vice*
KING & SPALDING LLP
1180 Peachtree St., NE
Atlanta, GA  30309
(404) 572-4600 (p)
(404) 572-5140 (f)

L. Louis Mrachek
Fla. Bar No. 182880
MRACHEK, FITZGERALD, ROSE
  KONOPKA, THOMAS &
  WEISS, P.A.
505 S. Flagler Drive, Suite 600
West Palm Beach, FL 33401
(561) 655-2250 (p)
(561) 655-5537 (f)

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ...............................................................................................3

    A.   SMF's Relationship with Grant Thornton ...............................................3

    B.   Elements of an Audit Conducted Pursuant to Generally Accepted
    Auditing Standards (GAAS) ....................................................................4

        1.   The Role of the Audit Client..........................................................4

        2.   The Role of the Independent External Auditor...............................6

    C.   The Complaint Alleges that the Debtors Engaged in Improper Business
    Practices. ..................................................................................................7

        1.   The XM List....................................................................................8

        2.   The Incremental Allowance ............................................................8

        3.   The Pad ...........................................................................................8

    D.   The Debtors Knew Their Billing Practices Were Improper. ...................8

    E.   The Threadbare Allegations Regarding Grant Thornton .......................10

III. ARGUMENT ...................................................................................................11

    A.   Counts I through III Are Barred By the *In Pari Delicto* Doctrine.........11

    B.   Counts I Through IV Are Inadequately Pled as a Matter of Law and
    Should be Dismissed With Prejudice......................................................14

        1.   Counts I Through IV Fail to State a Claim Because They Are
        Devoid of Factual Allegations Demonstrating How Grant
        Thornton Failed to Meet the Standard of Care. .........................15

            a.   Counts I through III Rely on Conclusory Allegations..................15

            b.   Count IV Is Based Upon the Deficient Allegations of
            Counts I through III. ...................................................................17

i

        2.     Counts I through III Also Fail to State a Claim Because They Affirmatively Show Lack of Justifiable Reliance and Causation. ............18

            a.     The Debtors Did Not Justifiably Rely. ..........................................18

            b.     The Debtors' Claims Lack Causation. ...........................................20

        3.     Count III Fails As a Matter of Law Because Grant Thornton Lacked Knowledge of the Underlying Breach and There Are No Allegations of Substantial Assistance. ........................................................20

    C.     The Trustee's Malpractice Claims (Counts I through III) are Time-Barred in Part by the Applicable Statute of Limitations.......................................22

        1.     The Two-Year Statute of Limitations Applies...........................................23

        2.     The Two-Year Statute of Limitations Bars the Malpractice Claims as to All Grant Thornton Services Provided Before April 15, 2010...............................................................................................24

IV.    CONCLUSION................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allocco v. City of Coral Gables,*
    221 F. Supp. 2d 1317 (S.D. Fla. 2002) ................................................................................19

*Amerifirst Bank v. Bomar,*
    757 F. Supp. 1365 (S.D. Fla. 1991) ....................................................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................3, 14, 17, 18, 19, 21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).......................................................................14, 16, 17, 21

*Bryant v. Avado Brands Inc.,*
    187 F.3d 1271 (11th Cir. 1999) ............................................................................26

*Day v. Taylor,*
    400 F.3d 1272 (11th Cir. 2005) ......................................................................................4

*Earth Trades, Inc. v. T&G Corp.,*
    108 So. 3d 580 (Fla. 2013).......................................................................12, 13, 14

*First Fla. Bank, N.A., v. Max Mitchell & Co.,*
    558 So. 2d 9 (Fla. 1990).......................................................................................18

*Green v. Bartel,*
    365 So. 2d 785 (Fla. 3d DCA 1978) ...............................................................................24

*Hill v. Nagpal,*
    No. 12-21495-CIV, 2013 WL 246746 (S.D. Fla. Jan. 22, 2013)...........................................21

*In re Agape Litigation,*
    773 F. Supp. 2d 298 (E.D.N.Y. 2011) .................................................................................22

*In re Kindred,*
    No. 6:08-BK-02334-KSJ, 2009 WL 1788401 (Bankr. M.D. Fla. June 5, 2009)....................23

*In re Meridian Asset Mgmt., Inc.,*
    296 B.R. 243 (Bankr. N.D. Fla. 2003) .................................................................................22

*Jackson v. Bellsouth Telecomms.,*
    372 F.3d 1250 (11th Cir. 2004) .........................................................................................11

*Koch v. Royal Wine Merchs., Ltd.,*
    907 F. Supp. 2d 1332 (S.D. Fla. 2012) ...............................................................................18

iii

*Lesti v. Wells Fargo Bank, N.A.*,
    960 F. Supp. 2d 1311 (M.D. Fla. 2013)....................................................................................22

*Luzinski v. Peabody & Arnold LLP (In re Gosman)*,
    382 B.R. 826 (S.D. Fla. 2007) ..............................................................................12, 13, 14

*M/I Schottenstein Homes, Inc. v. Azam*,
    813 So. 2d 91 (Fla. 2002)......................................................................................................19

*McGee v. JP Morgan Chase Bank, NA*,
    520 F. App'x 829 (11th Cir. 2013) ........................................................................................19

*Official Comm. Of Unsecured Creditors of PSA, Inc. v. Edwards*,
    437 F.3d 1145 (11th Cir. 2006) ......................................................................................11, 12

*Postel Indus., Inc. v. Abrams Grp. Constr.*, LLC,
    No. 6:11-cv-1178-ORL-28, 2012 WL 4194660 (M.D. Fla. Sept. 19, 2012).........................15

*Powell v. Barrett*,
    496 F.3d 1288 (11th Cir. 2007) ...........................................................................................12

*Recreational Design & Constr., Inc. v. Wiss, Janney, Elstner Assoc., Inc.*,
    820 F. Supp. 2d 1293 (S.D. Fla. 2011) ...........................................................................15, 16

*Resnick v. AvMed, Inc.*,
    693 F.3d 1317 (11th Cir. 2012) ................................................................................3, 19, 20

*Seidman & Seidman v. Gee*,
    625 So. 2d 1 (Fla. 3rd DCA 1993).....................................................................................12, 14

*Sheils v. Jack Eckerd Corp.*,
    560 So. 2d 361 (Fla. 2d DCA 1990) ......................................................................................24

*Smith v. First Union Nat'l Bank*,
    No. 00-4485-CIV, 2002 WL 31056104 (S.D. Fla. Aug. 23, 2002) ..................................21, 22

*Tambourine Comercio Internacional SA v. Solowsky*,
    312 F. App'x 263 (11th Cir. 2009) ........................................................................................23

*Tello v. Dean Witter Reynolds, Inc.*,
    410 F.3d 1275 (11th Cir. 2005) .............................................................................................22

*U.S. v. Kelly*,
    888 F.2d 732 (11th Cir. 1989) ................................................................................................4

*Wilder v. Meyer*,
    779 F. Supp. 164 (S.D. Fla. 1991) ........................................................................................24

*Woods v. Barnett Bank of Ft. Lauderdale*,
    765 F.2d 1004 (11th Cir. 1985) ................................................................22

**STATUTES**

11 U.S.C. § 108(a) ..................................................................................................24

11 U.S.C. § 548(a)(1)(B) ........................................................................................17

15 U.S.C. § 78c(a)(58)(A) .......................................................................................8

15 U.S.C. § 78j ....................................................................................................4, 8

15 U.S.C. § 78l ........................................................................................................3

15 U.S.C. § 78m(a)(2) .............................................................................................3

15 U.S.C. § 78r ........................................................................................................4

15 U.S.C. § 7241 .....................................................................................................4

15 U.S.C. § 7242 .....................................................................................................4

18 U.S.C. § 1348 .....................................................................................................4

18 U.S.C. § 1350 .....................................................................................................4

Fla. Stat. § 95.11(4)(a) ......................................................................................23, 24

Fla. Stat. § 726.105(1)(b) ......................................................................................17

Fla. Stat. § 726.106(1) ...........................................................................................17

**AUDITING AND ACCOUNTING STANDARDS**

Statement on Auditing Standards, AU § 110.02 .....................................................6

Statement on Auditing Standards, AU § 110.03 ..................................................5, 6

Statement on Auditing Standards, AU § 220.02 .....................................................6

Statement on Auditing Standards, AU § 230.10 .....................................................7

Statement on Auditing Standards, AU § 230.11 .....................................................6

Statement on Auditing Standards, AU § 230.12 .....................................................7

Statement on Auditing Standards, AU § 230.13 .....................................................7

Statement on Auditing Standards, AU § 310.06 .....................................................5

Statement on Auditing Standards, AU § 316.04 ........................................................................5

Statement on Auditing Standards, AU § 316.08 ........................................................................6

Statement on Auditing Standards, AU § 316.10 ........................................................................6

Statement on Auditing Standards, AU § 317.03 ........................................................................5

Statement on Auditing Standards, AU § 317.07 ........................................................................5

Statement on Auditing Standards, AU § 326.23 ........................................................................6

Statement on Auditing Standards, AU § 333.01 ........................................................................5

Statement on Auditing Standards, AU § 333.06 ........................................................................5

Statement on Auditing Standards, AU § 722.09 ........................................................................7

## OTHER AUTHORITIES

17 C.F.R. § 229.407 (2012) ........................................................................................................8

FED. R. BANKR. P. 7008 ............................................................................................................14

FED. R. BANKR. P. 7012 ..............................................................................................................1

FED. R. CIV. P. 8 ............................................................................................................14, 17, 18

FED. R. CIV. P. 12(b)(6) ...............................................................................................1, 14, 17, 18, 22

Section 552 of the Restatement (Second) of Torts ....................................................................18

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, Defendant Grant Thornton LLP ("Grant Thornton") hereby moves the Court to dismiss in part the Adversary Complaint for Damages and to Avoid and Recover Avoidable Transfers and Demand for Jury Trial By and Before the Bankruptcy Court ("Complaint") filed by Plaintiff Soneet R. Kapila, Liquidating Trustee of the SMF Energy Liquidating Trust ("Trustee").  (ECF-1.)

Contemporaneously with this Motion, Grant Thornton is filing with the United States District Court for the Southern District of Florida a Motion to Withdraw the Reference of this adversary proceeding to the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), in accordance with Local Bankruptcy Rule 5011-2, FED. R. BANKR. P. 5011, and 28 U.S.C. § 157(d).  In that Motion, Grant Thornton asks the District Court to withdraw the reference immediately.  Thus, nothing herein should be construed as a consent by Grant Thornton to the Bankruptcy Court's exercise of authority to conduct a jury trial, to enter a final order or judgment in this proceeding, or to submit proposed findings of fact and conclusions of law, and nothing herein is intended to confer upon the Bankruptcy Court any authority or jurisdiction that would not otherwise exist.

## I.    INTRODUCTION

Grant Thornton, an accounting firm, is alleged to have served as the external auditor for the Debtors—SMF Energy Corporation ("SMF"), H&W Petroleum Company, Inc., SMF Services, Inc., and Streicher Realty, Inc. (collectively "the Debtors")—starting in June, 2005.[1] Grant Thornton audited the year-end financial statements of SMF, which were consolidated to include the operations of SMF's subsidiaries, including the Debtors.

---

[1] For this Motion, Grant Thornton assumes, as it must, the truth of the Complaint's well-pleaded factual allegations.

The Debtors' business was delivering gasoline and other fuel products to their customers. According to the Complaint, the Debtors for years deliberately overcharged their customers through billing practices (the "Upcharges") that were "virtually impossible to detect," profiting as a result. (Compl. ¶¶ 34, 93.)   The Debtors understood that their conduct was improper: before Grant Thornton was even engaged to serve as SMF's auditor, SMF's former auditor (KPMG LLP) and outside counsel had voiced serious concerns about the Upcharges. (*Id.* ¶¶ 48-53.) Yet, the Debtors increased the Upcharges over the next several years. (*Id.* ¶¶ 63-98.)

Now, the Debtors, through the Trustee standing in their shoes, claim in Counts I through III that they are entitled to recover damages from Grant Thornton because it did not "uncover" the Upcharges that the Debtors already knew were improper. (Compl. ¶ 143.)   In short, the Debtors seek to pin the blame on Grant Thornton for the Debtors' own bad business decisions. Florida law does not countenance claims of wrongdoers like the Debtors here, and bars such claims without hesitation, including on a motion to dismiss, under the doctrine of *in pari delicto*. The Debtors' claims also are barred in part by the statute of limitations.

Further, Counts I through IV should be dismissed for failure to state a claim under applicable pleading standards.   As a matter of law, Counts I through III fail because the Complaint alleges the Debtors knew that Grant Thornton's statements were false—allegations that defeat the justifiable reliance and causation needed for those claims.   Count III for aiding and abetting breach of fiduciary duty also fails to adequately allege that Grant Thornton had knowledge of and substantially assisted the breaches of fiduciary duty.   Count IV for avoidance and recovery of certain payments made to Grant Thornton is expressly based upon the "acts, omissions and claims alleged in Counts I through III" and thus suffers from the same fatal defects in those Counts.

Accordingly, for the reasons set forth below, Grant Thornton moves the Court to dismiss with prejudice Counts I through IV.

## II.    BACKGROUND

For this Motion, Grant Thornton assumes, as it must, the truth of the Complaint's well-pleaded factual allegations.  Conclusory allegations, formulaic recitations of the elements of a cause of action, and naked assertions devoid of further factual enhancement, however, are not presumed to be true at the pleading stage, and should be disregarded.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679-82 (2009) (referring to "well-pleaded facts," "well-pleaded factual allegations," and "well-pleaded, non-conclusory factual allegation[s]"); *see also*, *e.g.*, *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012) (applying *Iqbal*).

### A.    SMF's Relationship with Grant Thornton

In June 2005, the Debtors engaged Grant Thornton to audit SMF's consolidated year-end financial statements.  (Compl. ¶ 80.)  Prior to Grant Thornton, KPMG LLP ("KPMG") was SMF's external auditor.  (*Id.* ¶¶ 49, 71.)

Grant Thornton audited SMF's consolidated year-end financial statements for each of the fiscal years ended June 30, 2005 through June 30, 2011.  (Compl. ¶ 9.)  Grant Thornton also performed reviews of SMF's consolidated quarterly financial statements for those fiscal years and for the first two quarters of the June 30, 2012 fiscal year.  (*Id.*)

SMF's stock was publicly traded.  (Compl. ¶¶ 16-17, 19.)  As a public company, SMF was required by federal law to file with the Securities and Exchange Commission ("SEC") an annual Form 10-K that included SMF's audited year-end financial statements, and quarterly Form 10-Qs that included SMF's unaudited quarterly financial statements. 15 U.S.C. §§ 78l and 78m(a)(2); *see also* Compl. ¶ 25 ("SMF was subject to various layers of state and federal regulation" and "to the requirements of the Sarbanes-Oxley [Act]").  A public company, its

3

management and its directors are subject to criminal and civil liability for making material misrepresentations in a company's SEC filings. 15 U.S.C. §§ 78j, 78r; 18 U.S.C. § 1348. The Sarbanes-Oxley Act also requires a public company's senior management to "certify" the accuracy of the company's Form 10-Ks and Form 10-Qs, including the financial statements in them; false certification is a crime. 15 U.S.C. § 7241; 18 U.S.C. § 1350; *see also* Compl. ¶ 25 (SMF was subject to Sarbanes-Oxley requirements). In addition, lying to or deceiving an auditor is illegal. 15 U.S.C. § 7242. Here, the Complaint alleges that the Debtors publicly filed with the SEC quarterly and year-end financial statements that the Debtors materially misstated and that did not disclose the Debtors' Upcharges. (Compl. ¶¶ 13, 14, 86, 114.)

**B.** **Elements of an Audit Conducted Pursuant to Generally Accepted Auditing Standards (GAAS)**

The Debtors engaged Grant Thornton to audit SMF's consolidated year-end financial statements in accordance with auditing standards set forth by the Public Company Accounting Oversight Board ("PCAOB")—standards typically referred to as Generally Accepted Auditing Standards, or "GAAS."[2] (Compl. ¶ 81 and n.5.) The respective responsibilities of the Debtors and Grant Thornton are derived directly from GAAS.

**1.** **The Role of the Audit Client**

GAAS place responsibility for the financial statements on the audit client (here, the Debtors), not the independent external auditor:

---

[2] The PCAOB standards are incorporated by reference in the Complaint (*see* Compl. ¶¶ 81, 138-141) and are a proper subject for judicial notice. *See, e.g., Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005) (incorporation by reference); *U.S. v. Kelly*, 888 F.2d 732, 743 n.21 (11th Cir. 1989) (judicial notice of State Bar of Georgia handbook). The standards are derived from two sources: (1) auditing standards promulgated by the American Institute of Certified Public Accountants (referred to by "AU" section) and adopted by the PCAOB; and (2) auditing standards promulgated by the PCAOB (referred to by "AS" number). (Compl ¶ 81 and n.5.) These standards are available at: http://pcaobus.org/Standards/Auditing/Pages/default.aspx.

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. . . . The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters . . . is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AU § 110.03. Indeed, as part of the audit, GAAS require the auditor to obtain written representations from the company. AU § 333.01.[3]

Likewise, GAAS place the responsibility for accounting policies and internal control over financial reporting on the company rather than on the external auditor:

> Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will . . . report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. . . . The auditor's knowledge of . . . internal control is limited to that acquired through the audit.

AU § 110.03; *see also* AU § 316.04 ("[I]t is management's responsibility to design and implement programs and controls to prevent, deter, and detect fraud").

GAAS also place squarely on the company's shoulders the responsibility "for identifying and ensuring that the entity complies with the laws and regulations applicable to its activities." AU § 310.06. External auditors, after all, are not lawyers and are not involved in the company's transactions or operations. *See* AU § 317.03 (determining whether an act is illegal "is normally beyond the auditor's professional competence"); AU § 317.07 (a GAAS audit "provides no assurance that illegal acts will be detected"). The Complaint itself alleges that the Debtors

---

[3] Those representations typically state that management disclosed all material items to the auditor; that management believes that the financial statements are stated in accordance with Generally Accepted Accounting Principles ("GAAP"); that management is not aware of any fraud or suspected fraud that could have a material impact on the financial statements; and that the company has complied with contract provisions that may affect the financial statements. AU § 333.06.

5

repeatedly turned to their lawyers, not their auditors, for opinions about the propriety and legality of their Upcharges.  (*See, e.g.,* Compl. ¶¶ 48, 51, 54, 117-18.)

> ### 2.    The Role of the Independent External Auditor

Under GAAS, the auditor's basic responsibility is to audit the company's financial statements by obtaining ***reasonable*** assurance as to whether the financial statements are stated, in all material respects, in accordance with GAAP.  AU § 110.02.  GAAS are clear that an audit has inherent and practical limitations that prevent the external auditor from obtaining ***absolute*** assurance that the financial statements are free from material misstatement.  AU § 110.02.

The independent external auditor is just that:  independent and external.  The auditor is not involved in the company's operations or underlying transactions, does not make the accounting entries reflected in the company's financial statements, and does not make business decisions for the company.  As a result, the auditor does not have, and cannot have, firsthand knowledge of the information in the financial statements.  *See, e.g.,* AU § 110.03 (quoted above); *see also* AU § 220.02.

To complete its audit in a timely and affordable manner, the auditor cannot look at or test every item reflected in the company's financial statements.  AU § 326.23 ("An auditor typically works within economic limits; the auditor's opinion, to be economically useful, must be formed within a reasonable length of time and at reasonable cost.").  Thus, a GAAS audit by necessity is based on testing samples of information and, "[i]n the great majority of cases, the auditor has to rely on evidence that is persuasive rather than convincing."  AU § 230.11.  GAAS also recognize that collusive activity and management override of internal controls—both of which are alleged to have occurred here—can avoid detection even in a properly performed audit.  *See, e.g.*, AU § 316.08 ("[f]raudulent financial reporting often involves management override of controls that otherwise may appear to be operating effectively"); AU § 316.10 ("collusion may cause the

auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false").

An audit's inherent limitations result in these fundamental realities, all recognized by GAAS: (1) An auditor can obtain reasonable assurance the financial statements are free from material misstatement but "[a]bsolute assurance [by the auditor] is not attainable." AU § 230.10; (2) Even "a properly planned and performed audit may not detect a material misstatement, whether caused by error or fraud." AU §§ 230.10; 230.12[4]; and (3) "[T]he auditor is not an insurer and his or her report does not constitute a guarantee." AU § 230.13. As described below, while the Complaint purports to invoke GAAS, its allegations ignore these GAAS tenets.

## C.   The Complaint Alleges that the Debtors Engaged in Improper Business Practices

For Counts I through III, the Trustee stands in the shoes of the Debtors to assert the Debtors' claims. The Complaint, however, alleges it was those very Debtors in whose shoes the Trustee stands that instigated and carried out the Upcharges. Grant Thornton's only alleged wrongdoing was not catching the Debtors in their own bad acts.

The Complaint alleges that, starting as early as 2003—two years before Grant Thornton was even hired to be the Debtors' external auditor—"SMF engaged in highly questionable and improper business practices resulting in the reliance of some of its customers on invoices that were materially inaccurate in terms of billing." (Compl. ¶ 34.) The Complaint describes the Debtors' business practices as "improper and hidden charges" that "violated the acceptable and agreed upon terms of contracts between the Debtors and their customers," and ultimately "grew

---

[4] The Complaint alleges that Grant Thornton also conducted reviews of SMF's quarterly financial statements. Grant Thornton did not issue reports on the quarterly financial statements and, as the Complaint acknowledges, "[a] Review is substantially narrower in scope than an audit." (Compl. ¶ 81); *see also* AU § 722.09 (reviews of interim financial information are "substantially less in scope than an audit" and "consist[] principally of performing analytical procedures and making inquiries of persons responsible for financial and accounting matters.")

to become a significant percentage of the revenue and business model of the Debtors." (*Id.* at ¶¶ 13-14.)  The Complaint identifies three Upcharges:

### 1.      The XM List

"The first revenue generating up charge implemented by SMF [on September 3, 2003] was the XM List," which "was a list of select customers for which SMF added various amounts to the price per gallon of fuel products sold," and was "difficult at best for customers to detect." (*Id.* ¶¶ 37-38, 42.)  SMF ended this practice in or about June 2007.  (*Id.* ¶ 44.)

### 2.      The Incremental Allowance

In May 2004, "SMF introduced another 'revenue enhancing' device" called the Incremental Allowance (the "I.A."), which consisted of "billing for gallons of fuel that were not delivered," and also was "virtually impossible to detect."  (*Id.* ¶¶ 35, 45, 93.)

### 3.      The Pad

"SMF also implemented another hidden up charge known as the 'Pad,'" which consisted of "an up charge in the price per gallon service charge."  (*Id.* ¶¶ 35, 72.)

### D.      __The Debtors Knew Their Billing Practices Were Improper__

The Complaint alleges that the Debtors knew the Upcharges were improper no later than August 2004, knowledge held by the Debtors' senior management:  the CEO, every executive responsible for the Debtors' financial reporting (the CFO, the VP of Finance and Accounting, and the Chief Accounting Officer), the CIO, and various Senior Vice-Presidents.  (Compl. ¶¶ 20, 50.)  Even the Debtors' Audit Committee, which was composed of independent directors charged by law with overseeing the Debtors' financial reporting, *see* 17 C.F.R. § 229.407 (2012); 15 U.S.C. §§ 78c(a)(58)(A), 78j(m), knew about the Upcharges.  (Compl. ¶¶ 51-71.)

The Complaint alleges that, in August 2004, KPMG—SMF's auditor before Grant Thornton was hired in June 2005—registered concerns with SMF about the tax impact of the I.A.

and the propriety of the I.A. practice.  (*Id.* ¶ 50.)  The Complaint also alleges that the Debtors'

outside counsel, Lee Terry ("Terry"), advised the Debtors to disclose the billing practices:

- On August 21, 2004, SMF's CEO, President and Chairman, Richard Gaithright, sent Terry an email stating that SMF was having problems with KPMG on "the tax impact (of the I.A.), together with the whole procedure."  (Compl. ¶¶ 20, 50.)

- On August 26, 2004, the minutes of the Executive Session of the Audit Committee "highlighted that KPMG continued to have concerns about the propriety of the I.A. practice."  (Compl. ¶ 51.)

- On August 31, 2004, Terry issued an Opinion Letter stating that the I.A. should be better disclosed.  (Compl. ¶ 53.)

- On September 21, 2004, Terry wrote an email stating his concern that his advice on disclosures had not been given priority "and that failure to implement the same was critical."  (Compl. ¶ 55.)

As a result, the Debtors' Audit Committee decided on October 12, 2004, that the I.A.

should be discontinued absent "clear and conspicuous disclosures," after which SMF's CEO sent

an email recognizing that management needed to eliminate the I.A.  (Compl. ¶¶ 59, 63.)

The Debtors, however, allegedly did not do as they had promised, and instead increased

the Upcharges:  "SMF did not discontinue the use of the I.A. and, in fact, the I.A. was more

robustly and universally applied as the years went on."  (*Id.* ¶ 58.)  The Upcharges became a

significant percentage of the revenue and business model of the Debtors, whose "main goal" was

to conceal the charges from its customers, all for "pure . . . profit  for the company."  (*Id.* ¶¶ 12-

14, 99, 106.)

The Complaint alleges that, despite SMF's awareness that the I.A. was an issue, SMF

continued to combine the I.A. charges and the actual gallons on invoices rather than record them

separately, making payment of taxes a "tangled web fraught with potential legal issues at every

turn" (Compl. ¶¶ 66-67), and never made the recommended disclosure modifications (*id.* ¶¶ 98-

99).  Instead, SMF's "cryptic effort" at a disclosure "was written in the same typeface and buried on the back of the invoice," and the "font . . . became smaller and smaller" over time (*id*. ¶ 100).

In June 2006, North Carolina initiated an audit of the state fuel taxes paid by SMF, including taxes paid on the I.A. gallons.  (Compl. ¶ 109.)  According to the Complaint, North Carolina instructed SMF in 2007 to stop charging the I.A. immediately and, when SMF failed to do so, counsel for the North Carolina Department of Revenue advised the Debtors that the I.A. was a misdemeanor under North Carolina law.  (*Id.*)  In June 2008, SMF finally instructed that the I.A. was to be stopped for all North Carolina customers.  (*Id.*)  Another state tax audit, this time by California, was reported to SMF's Board of Directors in September 2007.  (*Id.* ¶ 112.)[5]

It was not until November 2011, that the Debtors finally stopped charging the I.A. (Compl. ¶¶ 115-18.)  Because discontinuing the I.A. allegedly "choked off the company's revenue," the Debtors filed for Chapter 11 protection on April 15, 2012.  (*Id.* ¶¶ 120-23.)

E.    **The Threadbare Allegations Regarding Grant Thornton**

Now, trolling for a deep pocket to pay for the Debtors' alleged wrongdoing, the Trustee claims that Grant Thornton's audits should have "uncovered" the Debtors' Upcharges even though the Debtors already knew about, and were hiding, those Upcharges.  (Compl. ¶ 143.)  The allegations of Grant Thornton's purported breaches of its professional duties are conclusory at best, stating, for example, that Grant Thornton breached its duties to the Debtors by:

- "failing to use reasonable diligence, adequate care and skill, and best judgment in the conduct of the Audits of the Debtors." (*id.* ¶ 139);

- "violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits and/or Reviews including, but not limited to, those related to:  (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work

---

[5] SMF allegedly knew the XM List and the Pad were improper, too.  (*Id.* ¶¶ 41, 43, 78.)

No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (standards of Reporting No. 1), and (v) providing informative disclosure (Standards of Reporting No. 3). (*id.* ¶ 140); and

- "[violating] Statement on Auditing Standards ("SAS") no. 99 (AU Section 316 – Consideration of Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things, failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud." (Id. ¶ 141(a).

The Complaint presumes that, by not detecting the Upcharges, Grant Thornton's audits were not in compliance with GAAS even though, as discussed above in Part II.B, GAAS themselves provide that the failure to detect a misstatement does not mean that the audit was not performed in accordance with GAAS.

## III.   ARGUMENT

### A.   <u>Counts I through III Are Barred By the *In Pari Delicto* Doctrine.</u>

The Complaint's first three counts are for professional negligence/accounting malpractice (Count I), negligent misrepresentation (Count II), and aiding and abetting breach of fiduciary duty (Count III), collectively referred to herein as the "Malpractice Claims."  These are all claims of the Debtors; to assert them, the Trustee must stand in the shoes of the Debtors and is subject to precisely the same defenses as if the Debtors themselves had brought the claims.  *See Official Comm. Of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006) (Because the trustee does not acquire greater interests or rights than the debtor, "[i]f a claim of [the debtor] would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense.").

Here, the Complaint shows that all of the Malpractice Claims should be dismissed under the doctrine of *in pari delicto*.  *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir.

11

2004) ("[A]ny affirmative defense . . . may be considered in resolving a motion to dismiss when the complaint affirmatively and clearly shows the conclusive applicability of the defense to bar the action.") (internal citation omitted); *see also Luzinski v. Peabody & Arnold LLP (In re Gosman)*, 382 B.R. 826, 837 (S.D. Fla. 2007) (complaint is properly dismissed "when 'the allegations in the complaint, on their face, show that an affirmative defense bars recovery on the claim.'") (quoting *Powell v. Barrett*, 496 F.3d 1288, 1304 (11th Cir. 2007)).

The *in pari delicto* doctrine "refers to '[t]he principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" *Earth Trades, Inc. v. T&G Corp.*, 108 So. 3d 580, 583 (Fla. 2013). If the plaintiff's wrongdoing is substantially equivalent to—or, as here, greater than—that of the defendant, the *in pari delicto* doctrine bars the plaintiff's claim. *Earth Trades*, 108 So. 3d at 583; *Seidman & Seidman v. Gee*, 625 So. 2d 1 (Fla. 3rd DCA 1993) (reversing jury verdict against accounting firm "based on a theory of artificial prolongation of corporate life owing to auditing negligence, where the event that it should have, but failed to discover, was a fraud perpetrated by the corporate-client's controlling officer acting in furtherance of the corporation's purposes."); *accord Edwards*, 437 F.3d at 1152.[6]

---

[6] A court is often called upon to assess whether, as a matter of agency law, the wrongful conduct may be imputed to the corporate entity. *Gee*, 625 So. 2d at 3. Here, however, that is unnecessary because the Complaint itself imputes the improper actions to SMF, repeatedly alleging that "SMF"—not just SMF employees and directors—engaged in the alleged wrongful conduct. The Complaint alleges that the actions were committed *by* the company *for* the company. (*See* Compl. ¶¶ 12-14, 34, 99 ("SMF engaged in highly questionable and improper business practices," which consisted of "improper and hidden charges" that "grew to become a significant percentage of the revenue and business model of the Debtors" and represented "pure (albeit improper) profit for the company.") As the *Gee* court explained, "[w]here it is shown, without dispute, that a corporate officer's fraud intended to and did benefit the corporation, to the detriment of outsiders, the fraud is imputed to the corporation and is an absolute defense to the corporation's action against its accounting firm for negligent failure to discover the fraud." *Gee*, 625 So. 2d at 3. Those are precisely the circumstances alleged in the Complaint.

12

As detailed *supra* at pages 7-10, the Complaint alleges that the Debtors intentionally engaged in Upcharges that they concealed so effectively that they were "virtually impossible" and "difficult at best" for customers to detect. (Compl. ¶¶ 34, 93.) In contrast, Grant Thornton is alleged only to have missed opportunities to "uncover" the Debtors' wrongdoing. (*Id.* ¶ 143.)

The Complaint alleges that, long before Grant Thornton was hired as the Debtors' auditor, the Debtors had been told by their prior auditor, KPMG, and their outside counsel, Terry, that the Upcharges were problematic, so much so that the Debtors vowed to discontinue them. (Compl. ¶¶ 50-58.)  But the Debtors did not do so.  Instead, according to the Complaint, the Debtors increased their Upcharges, deliberately deceiving their customers and reaping more revenues.  This conduct allegedly caused the Debtors to materially misstate their quarterly and year-end financial statements. (*Id.* ¶¶ 46, 86, 98.)[7] Shirking their financial reporting and honesty obligations under federal (and other) law (*see supra* pages 3-4) and obviously aware that Grant Thornton had not detected their wrongdoing, the Debtors permitted Grant Thornton to complete its audits and issue unqualified audit opinions on the Debtors' financial statements—opinions that, if the Complaint allegations are to be believed, the Debtors fully understood at the time were incorrect. (Compl. ¶¶ 37, 54, 79, 114, 129.)  The Debtors then filed those audit opinions, along with SMF's financial statements, with the SEC even though the Complaint acknowledges that the Debtors knew those opinions and financial statements were wrong (*see, e.g.,* Compl. ¶ 13, 54, 114, 129), behavior that is highly illegal under federal law.

---

[7] More allegations of the Debtors' wrongdoing are:  (i) "SMF engaged in "highly questionable and improper billing practices" that "violated the acceptable and agreed upon terms of contracts between the Debtors and their customers" (*id.* ¶¶ 12-13, 34); (ii) "SMF's main goal was to preserve the I.A. and prevent its discovery" (*id.* ¶ 106); and (iii) "SMF was heavily dependent on the various pricing strategies devised, applied and concealed from customers" (*id.* ¶ 113).

On these allegations, there can be no legitimate question that the Debtors' alleged wrongdoing was equal to or greater than Grant Thornton's. *See, e.g., Gosman*, 382 B.R. at 838 (debtor's intentional conduct was "more objectionable" than the law firm's alleged negligence); *Earth Trades*, 108 So. 3d at 586-87 (plaintiff's knowledge that contractor lacked license was lesser degree of fault than contractor's failure to obtain the legally required license); *Gee*, 625 So. 2d at 3 (*in pari delicto* doctrine barred claim of receiver, standing in corporation's shoes, where corporation's officer committed fraud and claim against defendant accounting firm was failure to detect that fraud). Having alleged facts conclusively establishing the *in pari delicto* defense, the Malpractice Claims (Counts I, II, and III) must be dismissed with prejudice.

**B.    Counts I Through IV Are Inadequately Pled as a Matter of Law and Should be Dismissed With Prejudice.**

A Rule 12(b)(6) motion tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a Rule 12(b)(6) motion, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*).[8] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *Twombly*, 550 U.S. at 555 and n.3 (rejecting as insufficient "blanket assertions," "bare averment[s]," and "legal conclusion[s] couched as . . . factual allegations"). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Dismissal is required "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. Counts I

---

[8] The pleading standard under Federal Rule of Civil Procedure 8 is made applicable herein by Federal Rule of Bankruptcy Procedure 7008.

through IV—all premised in material respects on Grant Thornton's alleged malpractice—fail to meet these standards on multiple dispositive grounds and should be dismissed with prejudice.

### 1. Counts I Through IV Fail to State a Claim Because They Are Devoid of Factual Allegations Demonstrating How Grant Thornton Failed to Meet the Standard of Care.

#### a. Counts I through III Rely on Conclusory Allegations.

As stated above at page 11, Counts I through III are all based on Grant Thornton's alleged failure to conduct its audits and reviews of the Debtors' financial statements in accordance with GAAS.  A complaint for professional negligence that is "void of any allegations explaining **how** [the defendant] may have been careless" in the performance of its professional obligations is insufficient to withstand a motion to dismiss.  *Recreational Design & Constr., Inc. v. Wiss, Janney, Elstner Assoc., Inc.*, 820 F. Supp. 2d 1293, 1301 (S.D. Fla. 2011) (finding complaint failed to state professional negligence claim against engineering firm) (emphasis added); *see also Postel Indus., Inc. v. Abrams Grp. Constr. LLC*, Case No. 6:11-cv-1179-ORL-28, 2012 WL 4194660, at *2 (M.D. Fla. Sept. 19, 2012) (dismissing plaintiff's professional negligence claim because the complaint "offer[ed] only threadbare factual allegations to suggest how Defendants breached [their] duty").

At first blush, the Complaint looks fact-laden.  Closer inspection, however, reveals that very few of the alleged facts relate to Grant Thornton's conduct, and certainly do not explain **how** Grant Thornton violated its professional duties.[9]  Those few Complaint allegations about Grant Thornton's conduct are conclusory, essentially alleging that Grant Thornton must have violated GAAS because its audits did not discover the alleged Upcharges.  (*See* Compl. ¶¶ 134-

---

[9] The vast majority of allegations relate instead to events in 2004 (before Grant Thornton was even hired and about which Grant Thornton is not alleged to have any knowledge) and to actions of the Debtors, their officers, their directors, and their outside professionals *other* than Grant Thornton.

47; *see also id.* ¶ 129 ("Grant Thornton did not appear to adequately plan and perform its Audits in accordance with GAAS").  The Complaint's rote recitations of generic GAAS violations (*see id.* ¶¶ 138-42), untethered to factual allegations about what Grant Thornton did or did not do, fail the basic *Twombly* and *Iqbal* requirements.[10]

The Complaint's other allegations about Grant Thornton's conduct are inadequate, too. The Complaint alleges that Grant Thornton had "actual knowledge" of the I.A. and the percentage of SMF's revenue attributable to it, but the Complaint does not allege what that knowledge was, when Grant Thornton obtained it, or how whatever knowledge Grant Thornton had should have led Grant Thornton to suspect that the Debtors were misstating their financial statements.  (*See* Compl. ¶¶ 82-84.)  Indeed, the Complaint alleges that Grant Thornton "fail[ed] to comprehend the manner in which the [Upcharges] were imposed on SMF customers."  (*Id.* ¶ 86.)  Likewise, the Complaint alleges that the North Carolina tax audit was a "red flag" (Compl. ¶ 111), but fails to allege that Grant Thornton was even aware of that audit or how knowledge of a tax audit would suggest billing improprieties.  The Complaint alleges that Grant Thornton was told about the California tax audit in 2010 (*see id.* ¶ 112), but provides no facts about what Grant Thornton was told about the audit or how that information revealed Upcharges.

As in *Recreational Design*, the Complaint does not allege *how* Grant Thornton "shirked its professional duties."  The Complaint merely proclaims that Grant Thornton should have detected the concealed Upcharges and that it violated GAAS by not doing so.  (*See id.* ¶¶ 127-29, 134-47.)  The "bare averments" and "legal conclusions" alleged in the Complaint do not permit this Court "to infer more than the mere possibility of misconduct" by Grant Thornton, which is

---

[10] In addition, GAAS themselves gut these allegations; as set forth above at pages 4-7, GAAS expressly provide that, given the limitations inherent in an audit, the failure to discover a fraud or other misstatement does *not* mean that the audit violated GAAS.

not enough.  *Iqbal,* 556 U.S. at 679; *Twombly*, 550 U.S. at 555.  Thus, Counts I through III should be dismissed under Rules 8 and 12(b)(6) for failure to state a claim.

> **b.** ***Count IV Is Based Upon the Deficient Allegations of Counts I through III.***

In Count IV, the Trustee states affirmatively that the claim is "[b]ased upon the acts, omissions and claims alleged in Counts I through III . . . ." (Compl. ¶ 165), and alleges that SMF's payments to Grant Thornton for its accounting services constituted fraudulent transfers under Section 548 of the Bankruptcy Code and Sections 726.105(1)(b) and 726.106 of the Florida Uniform Fraudulent Transfer Act ("FUFTA").  The allegations in Counts I through III are legally insufficient for the reasons stated above and, as a result, cannot form a proper foundation for the claims in Count IV.

The statutes invoked in Count IV require the Trustee to establish, among other things, that the Debtors received less than "reasonably equivalent value" in exchange for the transfers.  *See* 11 U.S.C. § 548(a)(1)(B) ("[t]he trustee may avoid any transfer . . . made or incurred on or within two years before the date of the filing of the petition, if the debtor . . . (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation" and was either insolvent or had unreasonably small capital at the time of the transfer); Fla. Stat. § 726.105(1)(b) (a transfer is fraudulent as to present and future creditors if the debtor made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer" and was either insolvent or had unreasonably small capital at the time of the transfer) (emphasis added); Fla. Stat. § 726.106(1) (transfer is fraudulent as to present creditors if the debtor made the transfer "without receiving a reasonably equivalent value in exchange" and was insolvent or rendered insolvent at the time of the transfer).  The Complaint's allegation of lack of reasonably

equivalent value (at paragraph 172) is nothing more than a rote recitation of the element of the cause of action, which does not satisfy *Twombly* and *Iqbal*.

Count IV lacks the requisite factual basis to survive a motion to dismiss and should be dismissed under Rules 8 and 12(b)(6) for failure to state a claim.[11]

### 2. Counts I through III Also Fail to State a Claim Because They Affirmatively Show Lack of Justifiable Reliance and Causation.

In addition to being barred by the *in pari delicto* doctrine and pleading deficiencies, Counts I through III should be dismissed because the Complaint's fact allegations show that the Debtors could not justifiably rely on Grant Thornton's alleged misrepresentations and that Grant Thornton's alleged conduct did not cause the Debtors' alleged damages.

### a. *The Debtors Did Not Justifiably Rely.*

Count II is a claim for negligent misrepresentation, an essential element of which is that the plaintiff justifiably relied on the misrepresentation. *Koch v. Royal Wine Merchs., Ltd.*, 907 F. Supp. 2d 1332 (S.D. Fla. 2012).[12]   Here, Grant Thornton's alleged misrepresentations were its audit opinions on SMF's consolidated year-end financial statements, which allegedly were misstated because of the Upcharges.  (Compl. ¶¶ 14, 86, 148, 150.)  The Complaint, however, unequivocally and repeatedly alleges that the Debtors knew about the Upcharges, knew the Upcharges were improper, knew the revenue the Upcharges generated was being included in the

---

[11] Count IV also alleges, with no factual detail or support and without citation to a corresponding statutory provision that "[t]he Debtors made the Four Year Transfers with the actual intent to hinder or delay creditors." (Compl. ¶ 171.)  To the extent this allegation purports to state a claim for an intentional fraudulent conveyance, it must be dismissed.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 663.

[12] Count II does not specify whether it is asserted under Section 552 of the Restatement (Second) of Torts (as adopted in *First Fla. Bank, N.A., v. Max Mitchell & Co.*, 558 So. 2d 9 (Fla. 1990)) or whether it is a common law claim for negligent misrepresentation falling outside of Section 552. Either way, the claim requires proof that the plaintiff justifiably relied on the defendant's misrepresentation.  *Koch*, 907 F. Supp. 2d 1332; *Max Mitchell*, 558 So. 2d at 14.

Debtors' financial statements when it shouldn't have been, and knew that, as a result, Grant Thornton's audit opinions were incorrect.  (*Id.* ¶¶ 13, 14, 20, 34-79, 94-95, 98, 106, 114, 127, 129; *see also supra* pages 7-10.)   According to the Complaint, the Debtors knew about the improper Upcharges even before Grant Thornton was hired as SMF's auditor.  (*Id.* at ¶¶ 48-71.)  Because the Complaint affirmatively alleges that the Debtors knew the "truth" about Grant Thornton's allegedly false audit opinions, there can be no justifiable reliance on them.  *See M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 94 (Fla. 2002) ("reliance is improper" where the recipient of a misrepresentation "knows that . . . the statement is false or its falsity is obvious to him . . . .") (internal quotation marks omitted); *see also Allocco v. City of Coral Gables*, 221 F. Supp. 2d 1317, 1357 (S.D. Fla. 2002) (granting summary judgment for defendant on negligent misrepresentation claim where plaintiffs could not have relied because the alleged falsity of the statements "actually was known by each plaintiff.")

The Complaint's sole allegation of justifiable reliance also fails because it is wholly conclusory:  "The Debtors reasonably relied upon Grant Thornton's representation in, among other things, assessing its true financial condition, transferring millions of dollars to third parties and continuing to incur debt, with no ability to repay such debt."  (Compl. ¶ 154.)  "[T]his unexplained assertion is merely a '[t]hreadbare' recitation of negligent misrepresentation's 'reliance' element."  *McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 832 (11th Cir. 2013) (applying Florida law of negligent misrepresentation and concluding that allegation of justifiable reliance was conclusory and failed to show any manner in which defendant's statements misled plaintiff) (internal quotation marks omitted).  As such, it is insufficient to survive a motion to dismiss.  *Id.; see also Iqbal*, 556 U.S. at 678-81; *Resnick*, 693 F.3d at 1325.

19

### b.    *The Debtors' Claims Lack Causation.*

The same factual allegations demonstrating a lack of justifiable reliance defeat the causation allegations in Counts I through III.  *See Resnick*, 693 F.3d at 1325 (for negligence and breach of fiduciary duty claims, "Florida law requires a plaintiff to show that the defendant's challenged action caused the plaintiff's harm.").  By alleging that the Debtors already knew that the Upcharges were improper, the Complaint fails the *Iqbal* plausibility test when it alleges that the Debtors' alleged damages were caused by Grant Thornton's not detecting the Upcharges. (*See, e.g.,* Compl. ¶ 127 (alleging that the Debtors knew that their records were misstated by the Upcharges, "thereby resulting in, among other things, an unduly artificially prolonged existence causing increased insolvency, increased liabilities and diminution in assets and entrepreneurial value of the Debtors"—the injury Grant Thornton is alleged to have caused); *see also id.* at ¶¶ 13, 14, 20, 34-79, 94-95, 98, 106, 114, 129, 147, 155, 163.)

The causation allegations also are entirely conclusory and therefore insufficient to state a claim.  (*See, e.g.,* Compl. ¶ 163 ("Grant Thornton's foregoing acts and omissions are the direct and proximate cause of damages to the Debtors, which damages include, but are not necessarily limited to, the substantial increase in the Debtors' liabilities and diminution of the Debtors' assets, asset values and enterprise value."); *see also id.* ¶¶ 147, 155.)  Under *Iqbal*, the court's analysis begins by identifying "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Resnick¸* 693 F.3d at 1325 (quoting *Iqbal*).

### 3.    Count III Fails As a Matter of Law Because Grant Thornton Lacked Knowledge of the Underlying Breach and There Are No Allegations of Substantial Assistance.

Count III purports to state a claim for aiding and abetting breach of fiduciary duty by the Debtors' officers and senior management. (Compl. ¶¶ 156-163.)  The elements of a claim for aiding and abetting breach of fiduciary duty are:  "(1) a fiduciary duty on the part of the primary

wrongdoer; (2) a breach of this fiduciary duty; (3) ***knowledge of the breach*** by the alleged aider and abettor; and (4) the aider and abettor's ***substantial assistance or encouragement of the wrongdoing***." *Amerifirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991) (emphasis added); *Smith v. First Union Nat'l Bank*, No. 00-4485-CIV, 2002 WL 31056104, at **2-3 (S.D. Fla. Aug. 23, 2002).

Count III fails to allege any facts supporting an allegation that Grant Thornton knew of the alleged breaches or substantially assisted or encouraged them.  The Complaint alleges only that Grant Thornton "had knowledge of and rendered substantial assistance in regard to the breaches of fiduciary duties of the Debtors' officers and senior management, and by so doing aided and abetted such breaches by, among other acts and omissions, failing to perform audits in accordance with GAAS and GAAP, and by otherwise performing its audit and accounting services in a negligent, grossly negligent and/or reckless manner."  (Compl. ¶ 162.)  This sole allegation of Grant Thornton's "knowledge" and "substantial assistance" is precisely the "formulaic recitation of the elements of a cause of action" and "naked assertions devoid of further factual enhancement" that the Court must disregard under *Twombly* and *Iqbal*.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. 544.   Moreover, this wholly conclusory allegation is contradicted by the Complaint's allegations that Grant Thornton had a "complete failure to comprehend" the Debtors' Upcharges; "totally missed the existence of the Pad"; was "seemingly unmindful of the significant implications" of the tax issue; and "failed to detect" the improper billings.  (Compl. ¶¶ 85, 86, 111, 131.)

Lacking any plausible allegations about Grant Thornton's knowledge of the underlying breach of fiduciary duty, Count III should be dismissed with prejudice.  *See, e.g., Hill v. Nagpal*, No. 12-21495-CIV, 2013 WL 246746, at *3 (S.D. Fla. Jan. 22, 2013) (dismissing claim for

aiding and abetting breach of fiduciary duty where complaint "fail[ed] to allege . . . that the Counter-Defendants knew that the act for which they were providing substantial assistance was the breach of a fiduciary duty"); *In re Meridian Asset Mgmt., Inc.*, 296 B.R. 243, 263-64 (Bankr. N.D. Fla. 2003) (dismissing claim for aiding and abetting breach of fiduciary duty where allegations were insufficient to show that defendant-bank knew of wrongdoer's breach of fiduciary duties); *In re Agape Litig.*, 773 F. Supp. 2d 298, 307 (E.D.N.Y. 2011) (dismissing claim for aiding and abetting breach of fiduciary duty under comparable New York law where complaint failed to allege sufficient facts to "plausibly" show that bank had knowledge of breach of fiduciary duty).

Additionally, absent knowledge, there can be no "substantial assistance." *See, e.g.*, *Smith*, 2002 WL 31056104 at *2-3. As the *Smith* court noted, even in cases where knowledge could be shown through circumstantial evidence or reckless conduct, "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* at *3 (quoting *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1109 (11th Cir. 1985)). Here, the Complaint alleges a complete *lack* of awareness and as such, Count III should be dismissed with prejudice for failure to state a claim.

## C.   The Trustee's Malpractice Claims (Counts I through III) are Time-Barred in Part by the Applicable Statute of Limitations.

Dismissal under Rule 12(b)(6) on statute of limitations grounds is appropriate "if it is apparent from the face of the complaint that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005); *see also Lesti v. Wells Fargo Bank, N.A.*, 960 F. Supp. 2d 1311, 1317 (M.D. Fla. 2013). Here, the two-year statute of limitations for malpractice applies to each of the Malpractice Claims to bar claims for any services that Grant Thornton performed prior to April 15, 2010.

### 1.    The Two-Year Statute of Limitations Applies.

The Trustee's "professional negligence/accounting malpractice" claim (Count I) is subject to a two-year statute of limitations, which begins to run "from the time the cause of action is discovered or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.11(4)(a).  Although the Trustee's "negligent misrepresentation" claim (Count II) and "aiding and abetting breach of fiduciary duty" claim (Count III) are not styled as "professional negligence" or "professional malpractice" claims, they, just like Count I, are premised on Grant Thornton's alleged failure to conduct its audits in accordance with GAAS; indeed, Counts II and III incorporate by reference Count I's listing of alleged GAAS violations.  (*See* Compl. ¶¶ 136-46 (alleging in Count I that Grant Thornton deviated from GAAS by failing to detect the Debtors' Upcharges); ¶¶ 148, 152-53 (incorporating by reference Count I's alleged GAAS violations and alleging in Count II that Grant Thornton "negligently misrepresented that they had, among other things, conducted the Audits . . . in accordance with GAAS and that those financial statements fairly represented the true financial condition of the Debtors"); and ¶¶ 156, 158-62 (incorporating by reference Count I's alleged GAAS violations and alleging in Count III that Grant Thornton aided and abetted the SMF's officers and directors' alleged breaches of fiduciary duty by "failing to perform audits in accordance with GAAS").)

Malpractice claims are subject to the two-year statute of limitations regardless of what label the complaint gives them.  *See, e.g.*, *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 280 (11th Cir. 2009) ("Florida case law indicates that a claim styled as one for 'breach of fiduciary duty' . . . , when brought against a law firm or attorney for actions relating to the attorney-client relationship, is treated as a malpractice claim subject to the two-year statute of limitations."); *In re Kindred*, Case No. 6:08-BK-02334-KSJ, 2009 WL 1788401, at *4 (Bankr. M.D. Fla. June 5, 2009) (applying two-year statute of limitations to claim against attorney for

23

"breach of fiduciary duty" as "merely duplicative of the professional malpractice claim"); *Green v. Bartel*, 365 So. 2d 785, 786-88 (Fla. 3d DCA 1978) (applying two-year statute of limitations to claim against law firm for breach of fiduciary duty, breach of contract and negligence, finding that allegations of wrongdoing by the defendant, "ma[de] the action one in malpractice for an alleged wrongful act of the attorneys."); *Wilder v. Meyer*, 779 F. Supp. 164, 169 (S.D. Fla. 1991) (finding two-year statute of limitations governed plaintiff's negligence and breach of fiduciary duty claims against attorney who audited plaintiff's tax returns); *Sheils v. Jack Eckerd Corp.*, 560 So. 2d 361, 362-63 (Fla. 2d DCA 1990) (applying rules of statutory construction and finding that shorter two-year malpractice statute of limitations applied to a claim styled as one for "strict liability").

Because the face of the Trustee's Complaint shows that Counts I through III are premised on professional negligence, this Court should apply the two-year malpractice statute of limitations to each of the three Malpractice Claims, regardless of how the claims are styled.

### 2. The Two-Year Statute of Limitations Bars the Malpractice Claims as to All Grant Thornton Services Provided Before April 15, 2010.

When the Debtors filed for bankruptcy on April 15, 2012, any statute of limitations that had not expired for claims the Debtors had as of that date was tolled for two years. 11 U.S.C. § 108(a). The question thus becomes what malpractice-based claims the Debtors had as of April 15, 2012, that were not time-barred under the two-year malpractice statute of limitations.

The two-year malpractice statute of limitations begins to run "from the time the cause of action [was] discovered or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.11(4)(a). As described above at pages 7-10, the Complaint alleges that the Debtors knew of their wrongdoing *while* Grant Thornton was providing its audit and review services to the Debtors. This knowledge necessarily means that the Debtors also knew, at the

very moment Grant Thornton completed its audits and reviews without challenging the Upcharges, of Grant Thornton's alleged breaches of its professional duties. (*See, e.g.,* Compl. ¶ 82 (alleging that Grant Thornton's failure to raise the I.A. during an Audit Committee presentation in 2005 was "notable.").)

As a result, to the extent Counts I through III rely upon any alleged audits or reviews completed by Grant Thornton prior to April 15, 2010 (two years before the Debtors filed for bankruptcy), the claims are time-barred and should be dismissed with prejudice. The chart below illustrates those Grant Thornton audits and quarterly reviews as to which claims are time-barred:

| Fiscal Year Ended (Audits) | Quarter Ended (Quarterly Reviews) |
|---|---|
| June 30, 2005 | September 30,  2004<br>December 31, 2004<br>March 31, 2005 |
| June 30, 2006 | September 30, 2005<br>December 31, 2005<br>March 31, 2006 |
| June 30, 2007 | September 30, 2006<br>December 31, 2006<br>March 31, 2007 |
| June 30, 2008 | September 30, 2007<br>December 31, 2007<br>March 31, 2008 |
| June 30, 2009 | September 30, 2008<br>December 31, 2008<br>March 31, 2009 |
|  | September 30, 2009<br>December 31, 2009[13] |

---

[13] This Court may take judicial notice of SMF's Form 10-Q for the quarter ended December 31, 2009, which demonstrates that the unaudited quarterly financial statements, and Grant

## IV.    CONCLUSION

This Complaint is nothing more than an effort by the Debtors, through the Trustee standing in their shoes, to make Grant Thornton pay for what the Complaint repeatedly asserts was the Debtors' misconduct.  Taking the Complaint allegations as true, the Debtors designed, implemented, increased, and profited from the Upcharges, knowing all the while that those Upcharges were improper; filed with the SEC what the Debtors knew to be false financial statements and Grant Thornton audit opinions; and misled Grant Thornton during its audits. Despite this allegedly egregious conduct by the Debtors, the Complaint claims that the Debtors have damages claims against Grant Thornton for not telling the Debtors what they already knew. The Complaint is wrong.

For all of the reasons discussed herein, the Court should grant the Motion and order the following relief:

- Dismiss with prejudice Counts I through III on the basis of the *in pari delicto* doctrine;

- Dismiss with prejudice Counts I through IV for failure to state a claim due to the absence of plausible factual allegations as to how Grant Thornton violated its professional duties;

- Dismiss with prejudice Counts I through III because they show lack of justified reliance by the Debtors and lack of causation;

- Dismiss with prejudice Count III because it shows a lack of knowledge or substantial assistance by Grant Thornton; and

- Dismiss with prejudice Counts I through III insofar as they relate to any services provided by Grant Thornton prior to April 15, 2010, because they are time-barred.

---

Thornton's review, were necessarily complete by February 16, 2010, the date the Form 10-Q was filed with the Securities and Exchange Commission.  *See* Exhibit A (Form 10-Q for the quarter ended 12/31/2009); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999) (on motion to dismiss, court may take judicial notice of documents required to be filed with the SEC).

Dated:  April 18, 2014

                            MRACHEK,  FITZGERALD,  ROSE,  KONOPKA,
                            THOMAS & WEISS, P.A.
                            505 S. Flagler Drive, Suite 600
                            West Palm Beach, FL  33401
                            Telephone: (561) 655-2250
                            Facsimile: (561) 655-5537
                            Email: lmrachek@mrachek-law.com

                            By:  /s/ L. Louis Mrachek
                                L. Louis Mrachek
                                Florida Bar No. 182880

                            and

                            Elizabeth V. Tanis (pro hac vice)
                            Georgia Bar No. 697415
                            email: etanis@kslaw.com
                            Cheri A. Grosvenor (pro hac vice)
                            Georgia Bar No. 314360
                            email: cgrosvenor@kslaw.com
                            Kristen A. Lynn (pro hac vice)
                            Georgia Bar No. 702536
                            email: klynn@kslaw.com

                            KING & SPALDING LLP
                            1180 Peachtree St., N.E.
                            Atlanta, GA  30309-3521
                            Telephone: (404) 572-4600
                            Facsimile: (404) 572-5100

                            Attorneys for Defendant Grant Thornton LLP

27

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of April, 2014, a copy of the foregoing was served via the CM/ECF system upon the parties listed on the below Service List who have consented to electronic notice and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

By: <u>/s/ L. Louis Mrachek</u>
L. Louis Mrachek
Florida Bar No. 182880

## <u>SERVICE LIST</u>

### <u>Served Via CM/ECF Notification</u>

David C. Cimo, Esq. on behalf of Liquidating Trustee Soneet R. Kapila
dcimo@gjb-law.com; gjbecf@gjb-law.com